270 F.3d 863 (9th Cir. 2001)
 CARSON HARBOR VILLAGE, LTD., A LIMITED PARTNERSHIP DBA CARSON HARBOR VILLAGE MOBILHOME PARK, PLAINTIFF-COUNTER-DEFENDANT-APPELLANT,
v.
UNOCAL CORPORATION, A DELAWARE CORPORATION, DEFENDANT-CROSS-DEFENDANT, AND CITY OF CARSON, DEFENDANT-CROSS-DEFENDANT-CROSS-CLAIMANT-APPELLEE.
 Nos. 98-55056, 98-55107, 98-55210, 98-55213, 98-55215 and 98-55422
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted September 13, 1999
Filed September 14, 2000
Rehearing En Banc Granted and Opinion Withdrawn February 13, 2001
Argued and Submitted June 19, 2001
Filed October 24, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Frank Gooch III (argued), Gilchrist & Rutter, Santa Monica, California, and Christopher M. Amantea (argued), McDermott, Will & Emery, Los Angeles, California, for plaintiff-appellant Carson Harbor Village, Ltd.
 Lisa Bond (argued), Richards, Watson & Gershon, Los Angeles, California, for defendant-appellee City of Carson.
 Thomas C. Sites, Gallagher & Gallagher, Los Angeles, California, for defendant-appellee City of Compton.
 Charles A. Jordan, Holley & Galen, Los Angeles, California, and Richard C. Jacobs, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, California, for defendant-appellee Unocal Corporation.
 Walter J. Lipsman (argued), Douglas J. Collodel, and Richard H. Nakamura, Jr., Morris, Polich & Purdy, LLP, Los Angeles, California, for defendants-appellees Carson Harbor Village Mobile Home Park, Richard G. Braley, and Walker Smith, Jr.
 Gary E. Yardumian, Kristin E.D. Dunn, and Jack C. Nick, Prindle, Decker & Amaro, Long Beach, California, for defendant-appellee County of Los Angeles.
 Robert H. Oakley (argued), United States Department of Justice, Washington, D.C., for amicus curiae The United States of America.
 Appeal from the United States District Court for the Central District of California; Kim McLane Wardlaw, District Judge, Presiding. D.C. No. CV-96-03281-KMW.
 Before: Schroeder, Chief Judge, and Hug, B. Fletcher, Pregerson, Kozinski, T.G. Nelson, Hawkins, McKeown, Paez, Berzon, and Tallman, Circuit Judges.
 Opinion by Judge McKeown; Partial Concurrence and Partial Dissent by Judge B. Fletcher
 McKEOWN, Circuit Judge:
 
 
 1
 This appeal stems from the environmental cleanup of a contaminated wetlands site used originally for petroleum production and later as a mobile home park. The current property owner, Carson Harbor Village, Ltd. ("Carson Harbor"), brought suit principally under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. &#167 9601 et seq., for reimbursement of costs associated with the cleanup. We are called upon to determine whether, as a matter of law, those cleanup costs were "necessary" and whether certain of the defendants are "potentially responsible parties" ("PRPs") under CERCLA &#167 107(a), 42 U.S.C. &#167 9607(a).
 
 
 2
 The touchstone for determining the necessity of response costs is whether there is an actual threat to human health or the environment; that necessity is not obviated when a party also has a business reason for the cleanup. Because the district court erred in focusing on the ulterior business motive for remediation and because there are genuine issues of material fact regarding whether Carson Harbor's response costs were, in fact, "necessary," we cannot uphold summary judgment on this ground.
 
 
 3
 Even if we assume that those costs were necessary, we still must decide whether defendants Carson Harbor Village Mobile Home Park, Richard G. Braley, and Walker Smith, Jr. (the "Partnership Defendants") are PRPs; if not, summary judgment was nonetheless appropriate. Parsing the meaning of the term "disposal" in &#167 9607(a)(2) lies at the heart of this question. We conclude that the migration of contaminants on the property does not fall within the statutory definition of "disposal." Thus, on the CERCLA claim, we affirm the district court's grant of summary judgment for the Partnership Defendants.
 
 
 4
 We must also address the remaining issues. We affirm the district court's grant of summary judgment to defendants City of Carson, County of Los Angeles, and City of Compton on Carson Harbor's state claims. Finally, with respect to Carson Harbor's claim for indemnity against the Partnership Defendants, in view of our holding that there are genuine issues of material fact regarding the necessity of Carson Harbor's response costs, we reverse the grant of summary judgment.
 
 BACKGROUND
 
 5
 Carson Harbor owns and operates a mobile home park on seventy acres in the City of Carson, California. From 1977 until 1983, prior to Carson Harbor's ownership, defendant Carson Harbor Village Mobile Home Park, a general partnership controlled by defendants Braley and Smith (the "Partnership Defendants"), owned the property. They, like Carson Harbor, operated a mobile home park on the property. Beginning over thirty years earlier, however, from 1945 until 1983, Unocal Corporation held a leasehold interest in the property and used it for petroleum production, operating a number of oil wells, pipelines, above-ground storage tanks, and production facilities.
 
 
 6
 An undeveloped open-flow wetlands area covers approximately seventeen acres of the site. Properties located upstream from the property are in the Cities of Carson and Compton and unincorporated areas within the County of Los Angeles (i.e., the "Government Defendants"). Storm water feeds into the wetlands from those properties through storm drains. California Highway 91 (the Artesia Freeway), which is operated by the California Department of Transportation ("Caltrans"), is also located immediately upstream from the property. Runoff from approximately three miles of the highway drains into the wetlands.
 
 
 7
 While attempting to refinance the property in 1993, Carson Harbor discovered hazardous substances on the site. The prospective lender commissioned an environmental assessment, which revealed tar-like and slag materials in the wetlands area of the property. Subsequent investigation revealed that the materials were a waste or by-product of petroleum production and that they had been on the property for several decades prior to its development as a mobile home park.
 
 
 8
 Much of the tar-like and slag materials was covered with soil and vegetation. A portion of the tar-like material, however, was visible on the surface in an area measuring approximately twenty feet wide by thirty feet long. The slag material appeared to have been deposited on top of the tar-like material and was visible in an area approximately thirty feet by 170 feet. Subsequently, it was determined that the contaminated area covered an area approximately seventy-five feet wide by 170 feet long and extended from one to five feet below the surface. The material and surrounding soils contained elevated levels of petroleum hydrocarbons (measured in "total petroleum hydrocarbons" or "TPH") and lead; and soil samples upgradient of the materials also contained elevated levels of lead. These levels exceeded state reporting limits.
 
 
 9
 As required by law, Carson Harbor's environmental consultants reported their findings to the appropriate agencies. The Regional Water Quality Control Board (the "Water Quality Board") and its Site Cleanup Unit Chief, James Ross, assumed the lead in the cleanup effort. Carson Harbor requested a no-further-action letter from the Water Quality Board before proposing cleanup, and submitted a remedial action plan ("RAP"), proposing to remove the tar-like and slag materials and impacted soils. Because the highest concentrations of TPH and lead contamination were associated with the tar-like and slag materials, the RAP did not address other areas of elevated TPH and lead contamination. Ross approved the RAP but required Carson Harbor to bring the contamination down to a lower level than that proposed in the RAP.
 
 
 10
 The tar-like and slag materials were removed from the property in 1995. Over the course of five days, 1,042 tons of material were removed. In all but four of the soil samples taken after the cleanup, TPH and lead levels were within the state-required limits. The Water Quality Board staff conducted a site visit and independent soil testing. Ross then sent a closure letter to Carson Harbor, stating that
 
 
 11
 the removal is complete to the extent required by this Board . . . . [W]e have concluded that all the requirements established by this Board in our RAP approval letter . . . have been complied with. In addition, the contamination has been successfully removed and the remaining soil in the bottom of the watercourse poses no further threat to surface waters of the State. We, therefore, conclude that no further action is required at this site.
 
 
 12
 In 1997, Carson Harbor brought suit against the Partnership Defendants, the Government Defendants, and Unocal[1] seeking relief under federal environmental statutes, CERCLA, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. &#167 6901 et seq., and the Clean Water Act ("CWA"), 33 U.S.C. &#167 1251 et seq., and for state common law claims of nuisance, trespass, injury to easement, indemnity, and negligent nondisclosure. Carson Harbor sought to recover the costs of its cleanup (which totaled approximately $285,000) as well as damages arising from its inability to refinance the property. According to Carson Harbor, Unocal is responsible for dumping the tar-like and slag materials on the property; the Partnership Defendants are liable as past owners of the property; and the Government Defendants and Caltrans are liable for lead on the property that resulted from lead-contaminated storm water runoff, which may have contributed either to the lead found in the tar-like and slag materials or the elevated lead levels outside those materials.
 
 
 13
 The parties stipulated to the dismissal of the negligent non-disclosure claim and cross-moved for summary judgment on the remaining claims. The district court granted the defendants' motions on all claims except the state-law nuisance and trespass claims asserted against Unocal. See Carson Harbor Vill., Ltd. v. Unocal Corp., 990 F. Supp. 1188, 1199 (C.D. Cal. 1997). The court first held that Carson Harbor's CERCLA claim fails because it did not show that its remedial action was "necessary" under 42 U.S.C. &#167 9607(a)(4)(B) because there was no evidence of an "actual and real threat" to human health or the environment. Id. at 1193-94. In so holding, the district court disregarded certain evidence to the contrary as inadmissible hearsay. See id. at 1193 n.4. In the alternative, with respect to the Partnership Defendants, the district court held that they were not PRPs within the meaning of 42 U.S.C. &#167 9607(a)(2) because "disposal warranting CERCLA liability requires a showing that hazardous substances were affirmatively introduced into the environment. " Id. at 1195. And, with respect to the storm water runoff, there was no direct evidence that any lead-contaminated storm water entered the property at any time prior to 1983, when Carson Harbor purchased the property. Id.
 
 
 14
 The district court granted summary judgment on the RCRA claim because the "evidence shows that there was no imminent danger" to human health or the environment--a required element for a RCRA claim. Id. at 1196 (emphasis added). On the CWA claim, the court concluded that there was no evidence that the defendants violated a National Pollutant Discharge Elimination System ("NPDES") permit, as required for a CWA violation. Id. at 1197. With respect to the common law claims for nuisance, trespass, and injury to easement against the Government Defendants, the district court held that CAL. CIV. CODE &#167 3482, which provides that nothing done pursuant to express statutory authorization can be deemed a nuisance, provides a complete defense. Because Carson Harbor failed to show that the Government Defendants violated the NPDES permits, the court concluded, any pollutants discharged into the storm water were permissible. Id. Finally, the district court rejected Carson Harbor's claim for express indemnity against the Partnership Defendants, because the Water Quality Board did not require the cleanup. See id. at 1198-99.
 
 
 15
 Carson Harbor appealed the district court's rulings on the CERCLA claim, the state-law claims against the Government Defendants, and the indemnity claim against the Partnership Defendants.[2] Following the issuance of a panel opinion, we agreed to hear this case en banc.[3]
 
 DISCUSSION
 
 16
 We review de novo the district court's grant of summary judgment. Block v. City of Los Angeles, 253 F.3d 410, 416 (9th Cir. 2001). Similarly, "[t]he district court's interpretation of a statute is a question of law which we review de novo." Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1300 (9th Cir. 1997).
 
 I. CERCLA OVERVIEW
 
 17
 CERCLA "generally imposes strict liability on owners and operators of facilities at which hazardous substances were disposed." 3550 Stevens Creek Assocs. v. Barclays Bank, 915 F.2d 1355, 1357 (9th Cir. 1990). To achieve that end, CERCLA "authorizes private parties to institute civil actions to recover the costs involved in the cleanup of hazardous wastes from those responsible for their creation." Id.; accord Pinal Creek Group, 118 F.3d at 1300 ("Section 107(a) . . . authorizes suits against certain statutorily defined`responsible parties' to recover costs incurred in cleaning up hazardous waste disposal sites.") (internal quotation marks and citation omitted).
 
 
 18
 To prevail in a private cost recovery action, a plaintiff must establish that (1) the site on which the hazardous substances are contained is a "facility " under CERCLA's definition of that term, Section 101(9), 42 U.S.C. &#167 9601(9); (2) a "release" or "threatened release" of any "hazardous substance" from the facility has occurred, 42 U.S.C. &#167 9607(a)(4); (3) such "release" or "threatened release" has caused the plaintiff to incur response costs that were "necessary" and "consistent with the national contingency plan," 42 U.S.C. &#167 &#167 9607(a)(4) and (a)(4)(B); and (4) the defendant is within one of four classes of persons subject to the liability provisions of Section 107(a).
 
 
 19
 3550 Stevens Creek Assocs., 915 F.2d at 1358 (footnote omitted). The third and fourth of these elements are at issue here.
 
 
 20
 With respect to the fourth element, 42 U.S.C. &#167 9607(a) sets out the "four classes of persons subject to the liability provisions." Id. Those persons are "potentially responsible parties" or "PRPs." See Pritikin v. Dep't of Energy, 254 F.3d 791, 795 (9th Cir. 2001). We must decide in this case whether the Partnership Defendants fit within the second PRP category; namely, whether they owned the contaminated property "at the time of disposal of any hazardous substance." 42 U.S.C. &#167 9607(a)(2).
 
 
 21
 Also relevant to our analysis, although not the basis of the judgment here, is the fact that even if the plaintiff establishes the requisite four elements for recovery, a defendant may assert a variety of defenses to liability. Most relevant here are the so-called "third party" and "innocent landowner" defenses, by which a PRP may show that the release of hazardous substances was caused solely by "an act or omission of a third party," 42 U.S.C. &#167 9607(b)(3), or that "the disposal or placement of the hazardous substance" occurred before the PRP acquired the property. 42 U.S.C. &#167 9601(35)(A). In this way, the interpretation of "disposal" affects the application of these defenses. See infra section III.B.2.b.
 
 
 22
 Once liability is established, the defendant may avoid joint and several liability by establishing that it caused only a divisible portion of the harm--for example, it contributed only a specific part of the hazardous substances that spilled. Even if a defendant cannot do so, it may seek contribution from other PRPs under 42 U.S.C. &#167 9613(f)(1). See Pinal Creek Group, 118 F.3d at 1300 (noting that Congress's amendment of CERCLA to include &#167 9613(f)(1) "clarif[ies ] and confirm[s]" that contribution is available to PRPs). "A PRP's contribution liability will correspond to that party's equitable share of the total liability and will not be joint and several. " Id. at 1301. The contribution provision aims to avoid a variety of scenarios by which a comparatively innocent PRP might be on the hook for the entirety of a large cleanup bill.
 
 
 23
 II. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON WHETHER THE RESPONSE COSTS WERE "NECESSARY"
 
 
 24
 Remediation costs are recoverable under CERCLA only if "necessary." It is generally agreed that this standard requires that an actual and real threat to human health or the environment exist before initiating a response action. See, e.g., EPA v. Sequa Corp. (In re Bell Petroleum Serv., Inc.), 3 F.3d 889, 905-06 (5th Cir. 1993); Southfund Partners III v. Sears, Roebuck & Co., 57 F. Supp. 2d 1369, 1378 (N.D. Ga. 1999); Foster v. United States, 922 F. Supp. 642, 652 (D.D.C. 1996); Yellow Freight Sys., Inc. v. ACF Indus., Inc., 909 F. Supp. 1290, 1299 (E.D. Mo. 1995); G.J. Leasing Co. v. Union Elec. Co., 854 F. Supp. 539, 561-62 (S.D. Ill. 1994), aff'd, 54 F.3d 379, 386 (7th Cir. 1995).
 
 
 25
 Although the district court correctly referenced this standard, it went on to follow the "ulterior motive " analysis established by the district court in G.J. Leasing Co., 854 F. Supp. at 562. There, the court held that, to the extent cleanup activities are taken for reasons other than because of "an actual and real public health threat," cleanup costs are not "necessary." Id. Because there was evidence in G.J. Leasing that the cleanup of asbestos contamination was motivated by business reasons (specifically, the desire to convert the property to new uses), the court held that the cleanup costs were not "necessary." Accord Foster, 922 F. Supp. at 652-53; Yellow Freight Sys., 909 F. Supp. at 1299.
 
 
 26
 In concluding that Carson Harbor's response costs were not "necessary," the district court relied on G.J. Leasing's ulterior motive analysis. Specifically, it relied on the testimony of James Ross, the Water Quality Board Site Cleanup Unit Chief. Ross testified that he would "[n]ot likely" have required Carson Harbor to cleanup the site if Carson Harbor had not come to him with a remediation plan:
 
 
 27
 Q: [I]f the owners had not come to you with a remediation plan, if they had simply reported to you that this is what we see here, would you have required them to develop some remediation plan?
 
 
 28
 A: Not likely.
 
 
 29
 Q: As far as you were concerned, this stuff, even the slag and tar-like material, could have just stayed there?
 
 
 30
 A: Very likely.
 
 
 31
 Q: So, then, basically, this remediation was done at their initiative for their own reasons and not because of any environmental or health problem that was perceived by the Regional Board?
 
 
 32
 A: Yes.
 
 
 33
 Carson Harbor, 990 F. Supp. at 1193.
 
 
 34
 The district court's reliance on this testimony highlights its adoption of the G.J. Leasing analysis and its decision to disregard evidence that created a genuine issue of material fact on the linchpin issue of necessity. In determining whether response costs are "necessary," we focus not on whether a party has a business or other motive in cleaning up the property, but on whether there is a threat to human health or the environment and whether the response action is addressed to that threat. It is unrealistic to believe that clean up is necessarily motivated by eleemosynary factors. Although a private plaintiff will almost always have a business or financial motive for cleaning up a site, such subjective intent is simply not part of the calculus. Rather, we focus on the objective circumstances of each case. The issue is not why the landowner decided to undertake the cleanup, but whether it was necessary. See Cadillac Fairview/Cal., Inc. v. Dow Chem. Co., 840 F.2d 691, 695 (9th Cir. 1988) (necessity is a factual question). To hold otherwise would result in a disincentive for cleanup. Indeed, the cleanup may be motivated by many factors, such as fear of a government enforcement action, landowner liability, and even self-serving economic reasons.
 
 
 35
 Nor must a plaintiff show agency action as a prerequisite to cost recovery. Agency inaction is not dispositive of the question whether contamination presents an environmental risk worthy of response. See id. ("[T]he district court erred in ruling that some governmental entity must authorize and initiate a response action for that action to be necessary and consistent with the national contingency plan."); NL Indus., Inc. v. Kaplan, 792 F.2d 896, 898 (9th Cir. 1986) (holding that response costs can be "necessary" even though the agency that required cleanup never approved the response actions taken). Whether the Water Quality Board would have ordered remediation is not a definitive determination of whether there is a health or environmental risk.
 
 
 36
 Although agency inaction is not dispositive, an actual agency cleanup order is highly relevant and, in some cases, compelling on the necessity question. Here, there was conflicting evidence on this point. Some evidence in the record also suggests that the Water Quality Board required the remediation and that it perceived a threat to public health or the environment. In his deposition, Ross conceded that lead contamination from the tar and slag material presented a threat to surface and groundwater:
 
 
 37
 Q: Do you agree that this project was a surface water quality protection issue?
 
 
 38
 A: In part, yes.
 
 
 39
 Q: What do you mean "in part"?
 
 
 40
 A: Well, it also has the potential to be groundwater.
 
 
 41
 Q: Okay. So do you think that there might be a threat to groundwater as a result of the contamination on the property?
 
 
 42
 A: Certainly occurred to me.
 
 
 43
 Q: What hazardous substances on the property did you think were a threat to groundwater?
 
 
 44
 A: Lead primarily.
 
 
 45
 Q: Did the levels of lead that were found on this property have the potential to get into the groundwater?
 
 
 46
 A: Yes, the soluble lead.
 
 
 47
 Ross also testified that the level of lead contamination on the property "would require something to be done."
 
 
 48
 A review of the Water Quality Board's conduct also supports the conclusion that it perceived a threat to public health or the environment: The Board withheld the no-further-action letter Carson Harbor's consultant requested shortly after he sent the initial notice of contamination on the property. Instead of adopting the consultant's recommended cleanup levels, the Board required lower lead levels. And, after the cleanup, a Board representative inspected the site to verify that the contamination had been adequately remedied before it issued the no-further-action letter. Finally, the letter predicates closure on a finding that "the remaining soil in the bottom of the watercourse poses no further threat to surface waters of the State."
 
 
 49
 The district court also excluded certain evidence as hearsay, namely, the testimony of Carson Harbor's expert, environmental consultant Dr. Hassan Amini, and a memorandum written by a Unocal employee. In marked contrast to Ross's testimony that in the first instance a remediation would likely not have been required, Amini testified that the Water Quality Board ordered the cleanup, and the memorandum corroborates that testimony, as does correspondence between Amini and Ross.
 
 
 50
 When properly considered, this evidence of Ross's prior inconsistent statements creates a genuine issue of material fact about whether Carson Harbor's response costs were"necessary." This evidence falls within the "basic rule of evidence . . . that prior inconsistent statements may be used to impeach the credibility of a witness." United States v. Hale, 422 U.S. 171, 176 (1975); accord United States v. Bao, 189 F.3d 860, 866 (9th Cir. 1999) ("[B]ecause a declarant's prior inconsistent statement is not offered for its truth, it is not hearsay."). In addition, experts are entitled to rely on hearsay in forming their opinions. See Fed. R. Evid. 703 ("If [the underlying facts or data are] of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted."); United States v. McCollum, 732 F.2d 1419, 1422-23 (9th Cir. 1984) (applying Rule 703 to affirm the admission of expert testimony based on hearsay). Thus, the evidence was admissible because it was part of the basis for Amini's expert opinion about whether the contamination posed a threat to public health or the environment such that the Water Quality Board would require cleanup. The district court therefore erred by disregarding this evidence.
 
 
 51
 In light of this conflicting evidence, genuine issues of material fact preclude summary judgment on the issue of whether Carson Harbor's response costs were "necessary. " Therefore, with respect to Unocal and the Government Defendants the district court erred by granting summary judgment in their favor on the CERCLA claim. We discuss the CERCLA claim against the Partnership Defendants, below.
 
 
 52
 We decline to address in the first instance the Government Defendants' remaining CERCLA arguments, including their arguments that they are, nevertheless, entitled to summary judgment because Carson Harbor's response costs were not consistent with the national contingency plan, see 42 U.S.C. &#167 9607(a)(4)(B); because federally permitted releases are exempt from CERCLA coverage under 42 U.S.C. &#167 9607(j); and because the third party defense applies. We leave these issues for the district court's consideration on remand.
 
 
 53
 III. THE CONTAMINANT MIGRATION AT ISSUE HERE IS NOT A DISPOSAL UNDER CERCLA
 
 
 54
 The fourth element of Carson Harbor's cost recovery action requires a showing "that the defendant falls within one of four classes of persons subject to liability under 42 U.S.C. &#167 9607(a)." Kaiser Aluminum & Chem. Corp. v. Catellus Dev. Corp., 976 F.2d 1338, 1340 (9th Cir. 1992); accord 42 U.S.C. &#167 9613(f)(1) ("Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) . . . ." ). Those four categories of persons are "potentially responsible parties" or "PRPs."
 
 
 55
 To determine whether the Partnership Defendants are PRPs, we must decide whether there was a "disposal" during their ownership of the property. This inquiry rests on our interpretation of the statutory definition of "disposal." Based upon the plain meaning of the statute, we conclude that there was no disposal during the Partnership Defendants' ownership. Therefore, they are not PRPs, and they are not subject to liability. Accordingly, the district court did not err in granting summary judgment in their favor on the CERCLA issue.
 
 
 56
 A. PRPs, THE MEANING OF "DISPOSAL," AND CIRCUIT COURT INTERPRETATIONS
 
 
 57
 Section 9607(a), which sets out the four PRP categories, provides:
 
 
 58
 (1) the owner and operator of a vessel or a facility,
 
 
 59
 (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
 
 
 60
 (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
 
 
 61
 (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable . . . .
 
 
 62
 42 U.S.C. &#167 9607(a) (emphasis added). Carson Harbor argues that the Partnership Defendants fit within the second PRP category as owners of the property "at the time of disposal" under &#167 9607(a)(2).
 
 
 63
 CERCLA defines "disposal" for purposes of &#167 9607(a) with reference to the definition of "disposal " in RCRA, see 42 U.S.C. &#167 9601(29), which in turn defines "disposal" as follows:
 
 
 64
 The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.
 
 
 65
 42 U.S.C. &#167 6903(3) (emphasis added). Under this definition, for the Partnership Defendants to be PRPs, there must have been a "discharge, deposit, injection, dumping, spilling, leaking, or placing" of contaminants on the property during their ownership. Id.
 
 
 66
 Although we have previously concluded that RCRA's definition of "disposal" is "clear," 3550 Stevens Creek Assocs., 915 F.2d at 1362, whether the definition includes passive soil migration is an issue of first impression in this circuit. Other circuit courts have taken a variety of approaches. Those opinions cannot be shoehorned into the dichotomy of a classic circuit split. Rather, a careful reading of their holdings suggests a more nuanced range of views, depending in large part on the factual circumstances of the case. Compare United States v. 150 Acres of Land, 204 F.3d 698, 706 (6th Cir. 2000) (concluding that absent "any evidence that there was human activity involved in whatever movement of hazardous substances occurred on the property," there is no "disposal"), ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 359 (2d Cir. 1997) (holding that prior owners are not liable for the gradual spread of contamination underground), and United States v. CDMG Realty Co., 96 F.3d 706, 722 (3d Cir. 1996) ("[T]he passive spreading of contamination in a landfill does not constitute `disposal' under CERCLA."), with Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 846 (4th Cir. 1992) (holding past owners liable for the "disposal" of hazardous wastes that leaked from an underground storage tank).
 
 
 67
 The first circuit court to face the question was the Fourth Circuit in Nurad. There, the court addressed whether leaking from underground storage tanks is a "disposal. " 966 F.2d at 844-46. The current owner brought suit against two prior owners for reimbursement costs under CERCLA, claiming that the past owners were PRPs under &#167 9607(a)(2). Id. at 840. The court rejected the "active-only" approach, stating:
 
 
 68
 [T]his circuit has already rejected the "strained reading" of disposal which would limit its meaning to "active human conduct." United States v. Waste Ind., Inc., 734 F.2d 159, 164-65 (4th Cir. 1984). In Waste Industries, the court held that Congress intended the 42 U.S.C. &#167 6903(3) definition of disposal "to have a range of meanings," including not only active conduct, but also the reposing of hazardous waste and its subsequent movement through the environment. Id. at 164.
 
 
 69
 Id. at 845. The Fourth Circuit concluded "that &#167 9607(a)(2) imposes liability not only for active involvement in the `dumping' or `placing' of hazardous waste at the facility, but for ownership of the facility at a time that hazardous waste was `spilling' or `leaking.' " Id. at 846; accord Crofton Ventures Ltd. P'ship v. G & H P'ship, 258 F.3d 292, 300 (4th Cir.2001) (holding that, "[g]iven the breadth of the statutory definition of `disposal,' the district court must be able to conclude that the buried drums did not leak " when the defendants owned or operated the facility "to make a finding that [they] were not liable under &#167 9607(a)(2)").
 
 
 70
 Four years later, in CDMG Realty, the Third Circuit addressed whether the spread of contamination within a landfill is a "disposal." 96 F.3d at 710. There, as in Nurad, the current owner of contaminated property sought contribution from the prior owner, asserting that the prior owner was a PRP under &#167 9607(a)(2). Id. The Third Circuit held, based on the plain meaning of the words used to define "disposal" and the structure and purposes of CERCLA, see id. at 714-18, that "the passive migration of contamination dumped in the land prior to [the past owner's] ownership does not constitute disposal," id. at 711. The court specifically declined, however, "to reach the question whether the movement of contaminants unaided by human conduct can ever constitute `disposal,' " id., concluding that "[w]hile `leaking' and `spilling' may not require affirmative human conduct, neither word denotes the gradual spreading of contamination alleged here. " Id. at 714.
 
 
 71
 The next year, the Second Circuit, in ABB Industrial Systems, similarly addressed whether a current owner could recover cleanup costs under &#167 9607(a)(2) from several companies that had previously controlled the property. 120 F.3d at 353. As in CDMG Realty, the Second Circuit addressed whether there was a "disposal" where hazardous chemicals "continued to gradually spread underground" while the defendants controlled the property. Id. at 357. The Second Circuit, relying on the Third Circuit's analysis of CERCLA's langauge, structure, and purposes in CDMG Realty , affirmed the district court's grant of summary judgment to the defendants, holding "that prior owners and operators of a site are not liable under CERCLA for mere passive migration." Id. at 359. The court stated:
 
 
 72
 [T]here is no genuine issue of triable fact as to whether the dismissed defendants spilled chemicals or otherwise contaminated the property; moreover, although hazardous chemicals may have gradually spread underground while the dismissed defendants controlled the property (passive migration), we conclude that prior owners are not liable under CERCLA for passive migration . . . .
 
 
 73
 Id. at 354. The Second Circuit, however, "express[ed] no opinion" on whether "prior owners are liable if they acquired a site with leaking barrels [and] the prior owner's actions are purely passive." Id. at 358 n.3.
 
 
 74
 In 150 Acres of Land, the Sixth Circuit interpreted "disposal" for purposes of the "innocent landowner " defense. 204 F.3d at 704-05. In that context, the Sixth Circuit explicitly required active conduct for a "disposal." See id. at 706. The court concluded that the current owners, whose status as PRPs arises under &#167 9607(a)(1), acquired the property after the "disposal" under &#167 9601(35), because there is no "disposal" "[i]n the absence of any evidence that there was human activity involved in whatever movement of hazardous substances occurred on the property since [the current owners] have owned it." Id.; see also Bob's Beverage, Inc. v. Acme, Inc., 264 F.3d 692, 697-98 (6th Cir. 2001).
 
 
 75
 In sum, although all of the cases reference the active/ passive distinction in some manner, there is no clear dichotomy among the cases that have interpreted "disposal." Rather, the cases fall in a continuum, with the Sixth Circuit taking an "active-only" approach in 150 Acres of Land; the Third Circuit, in CDMG Realty, and the Second Circuit, in ABB Industrial Systems, addressing only the spread of contamination (and leaving open whether migration must always be "active" to be a "disposal"); and, finally, the Fourth Circuit in Nurad, concluding that "disposal" includes passive migration, at least in the context of leaking underground storage tanks.
 
 
 76
 We have not addressed whether "disposal" in &#167 9607(a) includes the passive movement of contamination. We have held, however, that the movement of contamination that does result from human conduct is a "disposal." See Kaiser Aluminum & Chem. Corp., 976 F.2d at 1342 (holding that "disposal" under &#167 9607(a)(2) includes a party's movement and spreading of contaminated soil to uncontaminated portions of property and that "Congress did not limit [`disposal'] to the initial introduction of hazardous material onto property").[4] In another context, we have held that "disposal" refers "only to an affirmative act of discarding a substance as waste, and not to the productive use of the substance." 3550 Stevens Creek Assocs., 915 F.2d at 1362 (concluding that there was no "disposal" of asbestos in a building when it was installed for use as insulation and fire retardant). We have also held that the definition of "disposal" is the same under &#167 9607(a)(2) and &#167 9607(a)(3). See id. ("Because the[`disposal'] definition applicable to actions under &#167 107(a)(2) and (a)(3) is the same, and there is no meaningful difference for purposes of CERCLA between a party who sells or transports a product containing or composed of hazardous substances for a productive use, and a party who actually puts that product to its constructive use, we see no reason to adopt a different definition in this case.").
 
 B. STATUTORY CONSTRUCTION[5]
 
 77
 When interpreting a statute, "[o]ur task is to construe what Congress has enacted." Duncan v. Walker , 121 S. Ct. 2120, 2124 (2001). "[W]e look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." Northwest Forest Res. Council v. Glickman, 82 F.3d 825, 830 (9th Cir. 1996) (internal quotation marks and citation omitted). We will resort to legislative history, even where the plain language is unambiguous, "where the legislative history clearly indicates that Congress meant something other than what it said." Perlman v. Catapult Entm't, Inc. (In re Catapult Entm't, Inc.), 165 F.3d 747, 753 (9th Cir. 1999). The plain meaning of the terms used to define "disposal " compels the conclusion that there was no "disposal" during the Partnership Defendants' ownership, because the movement of the contamination, even if it occurred during their ownership, cannot be characterized as a "discharge, deposit, injection, dumping, spilling, leaking, or placing." 42 U.S.C. &#167 6903(3). This approach is consistent with CERCLA's purposes, minimizes internal inconsistency in the statute, and presents no conflict with CERCLA's legislative history.
 
 1. PLAIN MEANING
 
 78
 "We begin, as always, with the language of the statute." Duncan, 121 S. Ct. at 2124; accord Perlman, 165 F.3d at 750. In examining the statutory language, we follow the Supreme Court's instruction and adhere to the "Plain Meaning Rule":
 
 
 79
 It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, . . . the sole function of the courts is to enforce it according to its terms.
 
 
 80
 Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise, and the rules which are to aid doubtful meanings need no discussion.
 
 
 81
 Caminetti v. United States, 242 U.S. 470, 485 (1917) (citations omitted); accord Negonsott v. Samuels, 507 U.S. 99, 104-05 (1993).
 
 
 82
 "When a statute includes an explicit definition,[however,] we must follow that definition, even if it varies from that term's ordinary meaning." Stenberg v. Carhart , 530 U.S. 914, 942 (2000). Therefore, we return to the definition of "disposal." Under &#167 6903(3), there is a "disposal" when there has been a
 
 
 83
 discharge,
 
 
 84
 deposit,
 
 
 85
 injection,
 
 
 86
 dumping,
 
 
 87
 spilling,
 
 
 88
 leaking, or
 
 
 89
 placing
 
 
 90
 of solid or hazardous wastes on the property. 42 U.S.C. &#167 6903(3). CERCLA does not define these terms, but we gain some insight into their statutory meaning by examining CERCLA's definition of "release," which includes some of the words used to define "disposal," as well as the word "disposing":
 
 
 91
 The term "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . .
 
 
 92
 42 U.S.C. &#167 9601(22) (emphasis added).
 
 
 93
 "We must presume that words used more than once in the same statute have the same meaning." Boise Cascade Corp. v. United States Envtl. Prot. Agency, 942 F.2d 1427, 1432 (9th Cir. 1991). Therefore, from these definitions, we can conclude that "release" is broader than "disposal," because the definition of "release" includes "disposing" (also, it includes "passive" terms such as "leaching " and "escaping," which are not included in the definition of "disposal"). But, at the same time, the definitions of "disposal " and "release" have several words in common: "discharge"/"discharging"; "injection"/"injecting"; "dumping"; "spilling"; and "leaking."
 
 
 94
 We thus focus on the plain meanings of the terms used to define "disposal." We first note that one can find both "active" and "passive" definitions for nearly all of these terms in any standard dictionary.[6] We therefore reject the absolute binary "active/passive" distinction used by some courts. Indeed, the substantial overlap in terms used to define "disposal" and "release" and the presence of both "active" and "passive" terms in both definitions suggests that something other than an active/passive distinction governs the terms.
 
 
 95
 Instead of focusing solely on whether the terms are"active" or "passive," we must examine each of the terms in relation to the facts of the case and determine whether the movement of contaminants is, under the plain meaning of the terms, a "disposal." Put otherwise, do any of the terms fit the hazardous substance contamination at issue?
 
 
 96
 Examining the facts of this case, we hold that the gradual passive migration of contamination through the soil that allegedly took place during the Partnership Defendants' ownership was not a "discharge, deposit, injection, dumping, spilling, leaking, or placing" and, therefore, was not a "disposal" within the meaning of &#167 9607(a)(2). The contamination on the property included tar-like and slag materials. The tar-like material was highly viscous and uniform, without any breaks or stratification. The slag material had a vesicular structure and was more porous and rigid than the tar-like material. There was some evidence that the tar-like material moved through the soil and that lead and/or TPH may have moved from that material into the soil. If we try to characterize this passive soil migration in plain English, a number of words come to mind, including gradual "spreading," "migration," "seeping," "oozing," and possibly "leaching." But certainly none of those words fits within the plain and common meaning of "discharge, . . . injection, dumping, . . . or placing." 42 U.S.C. &#167 6903(3). Although these words generally connote active conduct, even if we were to infuse passive meanings, these words simply do not describe the passive migration that occurred here. Nor can the gradual spread here be characterized as a "deposit," because there was neither a deposit by someone, nor does the term deposit encompass the gradual spread of contaminants.[7] The term "spilling" is likewise inapposite. Nothing spilled out of or over anything. Unlike the spilling of a barrel or the spilling over of a holding pond, movement of the tar-like and slag materials was not a spill.
 
 
 97
 Of the terms defining "disposal," the only one that might remotely describe the passive soil migration here is "leaking." But under the plain and common meaning of the word, we conclude that there was no "leaking. " The circumstances here are not like that of the leaking barrel or underground storage tank envisioned by Congress, as discussed infra, or a vessel or some other container that would connote "leaking." Therefore, there was no "disposal," and the Partnership Defendants are not PRPs. On this basis, we affirm the district court's grant of summary judgment to the Partnership Defendants on the CERCLA claim.
 
 
 98
 In adopting this plain meaning construction, we are mindful that the statute will be applied in a myriad of circumstances, many of which we cannot predict today. And although most of the terms generally connote active conduct, we agree with the Third Circuit that, for example, " `leaking' and `spilling' may not require affirmative human conduct, [although] neither word denotes the gradual spreading of contamination alleged here." CDMG Realty, 96 F.3d at 714. This approach does not rule out the scenario in which "spilling," "leaking," or perhaps other terms in some circumstances, encompasses passive migration. As discussed below, this approach is consistent with the purpose of CERCLA.
 
 2. READING THE STATUTE AS A WHOLE
 
 99
 No statutory provision is written in a vacuum. Complex regulatory statutes, in particular, often create a web-or, in the case of CERCLA, perhaps a maze -of sections, subsections, definitions, exceptions, defenses, and administrative provisions. Thus, we examine the statute as a whole, including its purpose and various provisions. See McCarthy v. Bronson, 500 U.S. 136, 139 (1991) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.") (quoting K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988)).
 
 
 100
 As outlined in section I, CERCLA is structured in such a way as to, first, implicate a range of operators, owners, and transporters as PRPs; second, offer certain of these PRPs affirmative defenses that allow them to avoid liability entirely; and third, provide judicial or administrative mechanisms limiting liability or encouraging early settlement. The interpretation of "disposal" controls the scope of parties designated as PRPs; thus, it has ripple effects on the applicability and effectiveness of the available defenses and administrative tools that complete the statutory structure. In examining this statute as a whole, then, we assess whether our interpretation of "disposal" is in accord with the statute's purpose, and creates or minimizes any internal inconsistency in CERCLA.
 
 A. STATUTORY PURPOSE
 
 101
 "CERCLA was enacted to protect and preserve public health and the environment by facilitating the expeditious and efficient cleanup of hazardous waste sites." Pritikin, 254 F.3d at 794-95 (internal quotation marks and citation omitted); accord 3550 Stevens Creek Assocs., 915 F.2d at 1357 ("CERCLA was enacted to `provide for liability, compensation, cleanup, and emergency response for hazardous substances released into the environment and the cleanup of inactive hazardous waste disposal sites.' ") (quoting Pub. L. No. 96-510, 94 Stat. 2767 (1980)). But CERCLA also has a secondary purpose--assuring that "responsible " persons pay for the cleanup:
 
 
 102
 CERCLA was a response by Congress to the threat to public health and the environment posed by the widespread use and disposal of hazardous substances. Its purpose was [(1)] to ensure the prompt and effective cleanup of waste disposal sites, and [(2)] to assure that parties responsible for hazardous substances bore the cost of remedying the conditions they created.
 
 
 103
 Pinal Creek Group, 118 F.3d at 1300 (quoting Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454, 1455 (9th Cir. 1986)). "We construe CERCLA liberally to achieve these goals." Kaiser Aluminum, 976 F.2d at 1340. At the same time, we have cautioned that "we must reject a construction that the statute on its face does not permit, and the legislative history does not support." 3550 Stevens Creek Assocs., 915 F.2d at 1363.
 
 
 104
 Our conclusion that "disposal" does not include passive soil migration but that it may include other passive migration that fits within the plain meaning of the terms used to define "disposal" is consistent with CERCLA's dual purposes. Holding passive owners responsible for migration of contaminants that results from their conduct and for passive migration ensures the prompt and effective cleanup of abandoned storage tanks, which, as discussed infra, is one of the problems Congress sought to address when enacting CERCLA. Indeed, if"disposal" is interpreted to exclude all passive migration, there would be little incentive for a landowner to examine his property for decaying disposal tanks, prevent them from spilling or leaking, or to clean up contamination once it was found.
 
 
 105
 B. INTERNAL CONSISTENCY AND AVOIDING ILLOGICAL RESULTS
 
 
 106
 Our plain-language interpretation of "disposal " also makes sense within the liability provisions of CERCLA -the sections identifying the parties that are "potentially responsible." As explained in section III.A, CERCLA creates four categories of PRPs: current owners or operators, owners or operators at the time of a disposal, arrangers, and transporters. See 42 U.S.C. &#167 9607(a). This categorization makes the best sense only under a plain-meaning interpretation of "disposal;" the extreme positions on either side render the structure awkward. For example, had Congress intended all passive migration to constitute a "disposal," then disposal is nearly always a perpetual process. See, e.g., CDMG Realty , 96 F.3d at 716. Hence, every landowner after the first disposal would be liable, and there would be no reason to divide owners and operators into categories of former and current. See, e.g., id. at 715; Ecodyne Corp. v. Shah, 718 F. Supp. 1454, 1457 (N.D. Cal. 1989). On the other extreme, had Congress intended "disposal" to include only releases directly caused by affirmative human conduct, then it would make no sense to establish a strict liability scheme assigning responsibility to "any person who at the time of disposal . . . owned or operated any facility." 42 U.S.C. &#167 9607(a)(2). Rather, the statute would have a straightforward causation requirement.
 
 
 107
 Similarly, our interpretation of "disposal" is sensible in light of CERCLA's twin concepts of "disposal," on one hand, and "release," on the other. As explained in section I, CERCLA holds a PRP liable for a disposal that "releases or threatens to release" hazardous substances into the environment. Some courts, examining this structure, note that it would be reasonable to conclude that Congress meant "disposal" and "release" to mean entirely different things -in other words, because "release" clearly requires no affirmative human conduct, "disposal" must be limited to affirmative human actions that make possible a "release." See, e.g., 150 Acres of Land, 204 F.3d at 706 ("[I]t makes sense . . . to have `disposal' stand for activity that precedes the entry of a substance into the environment and `release' stand for the actual entry of substances in to the environment.").
 
 
 108
 Working on a blank slate, it might make sense to design a statute with such clear-cut, distinct, and interlocking concepts. Sadly, the words of the statute stand in the way of such an easy explanation. The definition of "disposal, " as we have noted, includes the terms "discharge, deposit, injection, dumping, spilling, leaking, or placing." 42 U.S.C. &#167 6903(3). The definition of "release" includes "spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing." 42 U.S.C. &#167 9601(22). Even a quick glance reveals two important aspects of these definitions. First, each term encompasses some form of five words: "dump," "spill," "discharge," "injection," and "leaking." Second, "release" even incorporates the term "disposing" itself.
 
 
 109
 This structure defeats the notion that the two terms are mutually exclusive, or that subtle differences between them mean that "disposal" always requires affirmative human conduct and "release" does not. With five terms in common, the definitions compel the conclusion that there is at least substantial overlap between "disposal" and "release," and the overlap includes some of those terms whose definitions do not necessarily require human conduct, such as "spilling" and "leaking." Thus, we reject the interpretation that the difference in the definitions requires us to put a gloss on "disposal" that would make the terms mutually exclusive.[8]
 
 
 110
 This analysis suggests that the plain-meaning interpretation of "disposal" makes a good fit with the first part of CERCLA's overall structure-the assignment of presumptive liability to various parties.
 
 
 111
 CERCLA next allows certain PRPs to avoid liability by asserting various defenses. Most relevant here is the so-called "innocent owner" defense, which absolves from liability landowners who can show that "the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility" and that "[a]t the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility." 42 U.S.C. &#167 9601(35)(A). Our interpretation of "disposal" preserves the purpose and role of this defense within the statutory structure. The alternatives, on the other hand, would render the defense either impossible to present or entirely superfluous.
 
 
 112
 Were we to adopt an interpretation of "disposal " that encompassed all subsoil passive migration, the innocent landowner defense would be essentially eliminated. As discussed above, in all but a tiny fraction of cases,[9] such an interpretation would lead to the conclusion that disposal is a neverending process, rendering liable every landowner after the initial disposal. For those subsequent landowners, the innocent landowner defense would be available only if one could show that the land was purchased after the hazardous substances were "placed" there. Thus, the defense would only be available to a small portion of the landowners who have no actual culpability in the disposal of the hazardous substances.
 
 
 113
 Commentators have written the obituary for the innocent landowner defense many times since it was created in 1986. See, e.g., Rosemary J. Beless, Superfund's "Innocent Landowner" Defense: Guilty until Proven Innocent, 17 J. LAND RESOURCES & ENVTL. L. 247 (1997); Shane Clanton, Passive Disposal of the Innocent Landowner Defense, 9 J. NAT. RESOURCES & ENVTL. L. 255 (1993-1994); L. Jager Smith, Jr., Note, CERCLA's Innocent Landowner Defense: Oasis or Mirage?, 18 COLUM. J. ENVTL. L. 155 (1993). And, to be sure, Congress intended the defense to be very narrowly applicable, for fear that it might be subject to abuse. See infra section III.B.3.b. Nevertheless, we need not narrow the defense any more than Congress did in creating it.
 
 
 114
 The opposite extreme is no better fit. Were we to interpret "disposal" to include only actions caused by affirmative human conduct, we would eliminate the need for an innocent landowner defense altogether. Such an interpretation of "disposal" would exclude from liability even a landowner whose facilities "spill" or "leak" without affirmative human conduct-that is, anything short of an intentional dump during an owner's tenure. Under this interpretation, there would exist no landowner capable of presenting an innocent landowner defense who would not already be excluded from liability in the first place.[10] We doubt, even in the uncertain world of CERCLA, that Congress went to the trouble of amending the statute to create a defense that no one would need.
 
 
 115
 Our interpretation, on the other hand, preserves the defense and confirms the role chosen for it by Congress. It must be acknowledged, however, that our interpretation of "disposal" does not leave a seamless statute. The defense is phrased so as to extend to those who purchase property after "disposal or placement." 42 U.S.C. &#167 9601(35)(A) (emphasis added). Courts facing this wording have read it in a number of ways. Some have concluded that "or placement" is surplusage, and can be discarded. See CDMG Realty, 96 F.3d at 716 (concluding that the innocent landowner defense is available only "after the disposal"); see also Robert L. Bronston, Note, The Case Against Intermediate Owner Liability for Passive Migration of Hazardous Waste, 93 MICH. L. REV. 609, 628 (1994). We are bound, though, to give meaning to every word of a statute. Frustratingly, this canon of construction leads to the shortest of logical cul-de-sacs in this case. If we give meaning to both "disposal" and "placement, " how are the words different, particularly if we consider that "placement" is included in the statutory definition of "disposal"? And if the defense is available to anyone who purchases after "disposal," why repeat "placement" -a mere subcategory of "disposal"?
 
 
 116
 Clearly, neither a logician nor a grammarian will find comfort in the world of CERCLA. It is not our task, however, to clean up the baffling language Congress gave us by deleting the words "or placement" or the word "disposal" from the innocent landowner defense. Transported to Washington, D.C. in 1980 or 1986, armed with a red pen and a copy of Strunk & White's Elements of Style, we might offer a few clarifying suggestions. But in this time and place, we can only conclude that Congress meant what it said, and offered the innocent landowner defense to both those who purchased land after "disposal" or after "placement," thereby giving "disposal" its statutory meaning and "placement" its ordinary one, despite their overlap.
 
 
 117
 In sum, we conclude that the plain-meaning interpretation of disposal preserves the scope and the role of the defenses established by Congress.
 
 
 118
 The third part of CERCLA's structure includes a variety of provisions that instruct courts or the agency how to administer the liability provisions. These provisions, for example, allow a court to allocate liability on the basis of culpability, see, e.g., Pinal Creek Group, 118 F.3d at 1300-01; create a system by which de minimis contributors can escape joint and several liability, 42 U.S.C. &#167 9622(g); and authorize administrative policies encouraging early settlement with the EPA, shielding the settler from suit by other parties, see infra note 11. These mechanisms are often overlooked, but are crucial to the day-to-day realities of CERCLA administration and litigation. None of them has a direct impact on the interpretation of the term "disposal," so we will not discuss them in detail. But each of them, in different ways, attempts to ensure that a PRP with minimal responsibility-such as an owner without culpability but outside the technical parameters of the innocent owner defense -does not get stuck with more than his fair share of the financial responsibility for cleanup. In the real-world administration of the statute as a whole, these are the provisions that allow a court or the EPA to ensure that the parade of horribles -the liability of the five-minute landowner, the one-drop contributor, or the unknowing home-buyer-does not come to pass.[11]
 
 
 119
 Based on this analysis, we conclude that the plain meaning interpretation of "disposal" is consistent with the statute both in its constituent parts and as a whole.
 
 3. LEGISLATIVE HISTORY
 
 120
 Because the conclusion we reach is compelled by the plain meaning of the statute's text, our inquiry into legislative history is strictly limited. Although the Supreme Court has advised that recourse to legislative history is not necessary where a statute's plain meaning is clear, the Court does suggest that we review the legislative history to ensure that there is no clearly contrary congressional intent. See, e.g., Salinas v. United States, 522 U.S. 52, 57-58 (1997); Dunn v. Commodity Futures Trading Comm'n, 519 U.S. 465, 471 & n.8, 473-74, 478 (1997); Darby v. Cisneros, 509 U.S. 137, 147 (1993); John Doe Agency v. John Doe Corp., 493 U.S. 146, 155 (1989).[12] Here, we scan CERCLA's legislative history to determine whether intentions contrary to the plain meaning are present. Our review reveals no such indication. On the contrary, the available materials demonstrate that the public, the EPA, and drafters of the legislation used and understood the words "discharge, deposit, injection, dumping, spilling, leaking, or placing" in their ordinary, plain-meaning sense, encompassing events both caused by affirmative human conduct and, particularly in the case of "spill" and "leak," occurring solely in a passive context as well. Because we find no indication that Congress intended anything other than what it said, we present here only a few brief examples.
 
 A. CERCLA
 
 121
 Any inquiry into CERCLA's legislative history is somewhat of a snark hunt. Like other courts that have examined the legislative history, we have found few truly relevant documents. See, e.g., CDMG Realty, 96 F.3d at 706 n.2. This is not surprising, given the circumstances surrounding the bill's passage.[13] One searches in vain for committee reports or floor statements explaining the purpose of subtle or even dramatic changes from early versions of the bill to final passage.[14] See generally Frank P. Grad, A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability ("Superfund") Act of 1980, 8 COLUM . J. ENVTL. L. 1 (1982). Nevertheless, those materials that do exist confirm the plain-meaning interpretation of "disposal."
 
 
 122
 As an initial matter, it is evident that CERCLA's primary targets included spills and leaks from abandoned sites -sites at which there was no longer any affirmative human activity. The two incidents of hazardous substance contamination that most prominently prompted congressional action-Love Canal and the Valley of the Drums[15]-were both abandoned hazardous waste sites that were described as spilling or leaking with no affirmative human conduct.
 
 
 123
 Hearing testimony further confirmed that both the EPA and the legislators understood that hazardous substances legislation would deal with a wide range of disposal events, not predicated on an "active/passive" dichotomy. EPA Assistant Administrator Thomas Jorling testified that one "common problem" is abandoned sites with "barrels and tanks . . . leaking, allowing contamination of surface and ground waters and frequently producing a severe fire or explosion potential . . . The effects of the abandoned waste disposal sites are similar to spills of hazardous substances . . . ." Hazardous and Toxic Waste Disposal: Joint Hearings Before the Subcommittees on Environmental Pollution and Resource Protection of the Senate Committee on Environment and Public Works, 96th Cong. 34 (1979) (statement of Thomas C. Jorling, Assistant Administrator, Water and Waste Management, Environmental Protection Agency), reprinted at 1 Committee Print, supra note 13, at 89-90. Assistant Administrator Jorling further explained why a leak or discharge can occur without human interaction:
 
 
 124
 [Lagoons and ponds] as a group represent a large potential danger to public health and the environment . . . . In those areas where precipitation exceeds evaporation . . . surface impoundments will eventually either leak or overflow and discharge to surface waters.
 
 
 125
 Id. at 88.
 
 
 126
 In addition, the primary legislative sponsors and relevant committees regularly used the words "spill" or "leak" to describe passive events at abandoned sites. Representative Florio summarized the evils that CERCLA aimed to fix: "Hundreds, possibly thousands, of neglected, leaking disposal sites presently dot the country-threatening to release their lethal contents, despoiling water supplies and menacing public health." 126 CONG. REC. 26377 (1980), reprinted at 2 Committee Print, supra note 13, at 226.[16] House committee reports included similar statements reflecting the passive aspects of "spill" or "leak."[17] Similar statements were made by individual senators,[18] as well as Senate committee reports.[19]
 
 B. SARA
 
 127
 In 1986 Congress enacted the Superfund Amendments and Reauthorization Act ("SARA"), aimed at speeding cleanup and forcing quicker action by the EPA.[20] Most significantly for our purposes, Congress created the innocent landowner defense that we have already discussed. See 42 U.S.C. &#167 9601(35)(A). It did not do so, however, by creating a straightforward exception to CERCLA liability. In a single stroke, SARA first clarified that one who purchases land from a polluting owner or operator cannot present a third-party defense, then set conditions under which this limit would not apply-that is, if the property were purchased after disposal or placement, and the purchaser did not know and had no reason to know that hazardous substances were disposed of there. The plain-meaning interpretation of "disposal " we adopt leaves in place the narrow applicability of the defense. This reading is confirmed by floor statements of the defense's author, Representative Frank, who indicated that the innocent owner defense was unavailable to anyone who contributed, actively or passively, to the release of the substance:
 
 
 128
 This amendment says that wholly innocent landowners will not be held liable. We have had problems before with the leases being granted improvidently. This amendment, I must say, is drafted in a way to make that extremely unlikely. To get a release from liability under this section, a landowner must not have himself or herself allowed or permitted any storage, not have contributed to the release of any substance and, and this is very important, the landowner has the burden of proof to show that this landowner had neither actual nor constructive knowledge at the time of purchase that the property had been used for hazardous waste materials. In other words, you can get a release under this only if you can show by the preponderance of the evidence that you not only did not contribute to it; you did not even know when you bought it that it had this there.
 
 
 129
 131 CONG. REC. 34715 (1985) (statement of Rep. Frank). Accordingly, the legislative history of the innocent owner defense does not contradict the plain meaning interpretation of "disposal," but rather is consistent with this formulation.
 
 C. CONCLUSION
 
 130
 In sum, we hold that, in light of the plain meaning of the terms used to define "disposal" in &#167 6903(3), the alleged passive migration of contaminants through soil during the Partnership Defendants' ownership was not a "disposal " under &#167 9607(a)(2). This plain-meaning approach is consistent with the statute as a whole and its legislative history. The Partnership Defendants are thus entitled to summary judgment on the CERCLA claim.
 
 IV. OTHER ISSUES
 
 131
 A. STATE CLAIMS AGAINST GOVERNMENT DEFENDANTS
 
 
 132
 The district court held that California Civil Code &#167 3482 precludes Carson Harbor's state claims against the Government Defendants. Section 3482 provides that "[n]othing which is done or maintained under the express authority of a statute can be deemed a nuisance." CAL. CIV. CODE &#167 3482. Here, the Water Quality Board issued NPDES permits to the Government Defendants in 1990 and 1996. Those permits authorized the discharge of storm water containing pollutants, and there is no evidence that there was any lead-contaminated storm water runoff to the property prior to 1994 or a violation of the permits. Therefore, the district court properly granted summary judgment to the Government Defendants on the state law claims.
 
 
 133
 B. Indemnity Claim Against Partnership Defendants
 
 
 134
 The district court granted the Partnership Defendants' motion for summary judgment on Carson Harbor's indemnity claim under the purchase and sale agreement, based on its conclusion that the response costs were not "necessary" under &#167 9607(a)(4)(B). See Carson Harbor, 990 F. Supp. at 1198. Under the purchase and sale agreement, which the Partnership Defendants and Carson Harbor executed in 1983, the Partnership Defendants agreed to indemnify and hold Carson Harbor harmless "from and against any . . . damage, cost, expense . . . liability . . . suffered by [Carson Harbor] resulting, directly or indirectly, from . . . any liability or obligation of [the Partnership Defendants] which [Carson Harbor] is not specifically required to assume hereunder." Thus, the Partnership Defendants are liable for damages and costs Carson Harbor suffered in connection with its cleanup of the property if the Partnership Defendants would have been required to clean up the property in 1983.
 
 
 135
 To survive summary judgment on this claim, Carson Harbor must raise a genuine issue of material fact. Carson Harbor argues that, because it was required to remove the hazardous substances in 1995, the Partnership Defendants would have been required to remove them in 1983. Because we conclude that there is a genuine issue of material fact concerning whether Carson Harbor's 1995 cleanup costs were "necessary" (i.e., whether the Water Quality Board perceived a threat to public health or the environment and whether it required the remediation), we reverse the grant of summary judgment in favor of the Partnership Defendants.
 
 Conclusion
 
 136
 We REVERSE the grant of summary judgment in favor of Unocal and the Government Defendants on the CERCLA claim. With respect to the Partnership Defendants, we AFFIRM the grant of summary judgment in their favor on the CERCLA claim. We also AFFIRM the grant of summary judgment to the Government Defendants on the state claims. Finally, we REVERSE the district court's grant of summary judgment to the Partnership Defendants on Carson Harbor's indemnity claim under the purchase agreement. The case is REMANDED for further proceedings consistent with this opinion. Each party shall bear its own costs on appeal.
 
 
 137
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 Notes:
 
 
 [1]
 Although Caltrans and James W. van Loben Sels, as the Director of Caltrans, are also named in the complaint, they are not identified in any of the causes of action at issue in this appeal.
 
 
 [2]
 Carson Harbor did not pursue its appeal of the district court's rulings on the RCRA and CWA claims.
 
 
 [3]
 Carson Harbor Vill., Ltd. v. Unocal Corp., 240 F.3d 841 (9th Cir. 2001) (withdrawing Carson Harbor Vill., Ltd. v. Unocal Corp., 227 F.3d 1196 (9th Cir. 2000)).
 
 
 [4]
 Similarly, under the Clean Water Act ("CWA"), 33 U.S.C. &#167 1311(a), the movement of soil in the context of an agricultural activity called "deep ripping" (i.e., deep plowing) can be a "discharge" of pollutants into wetlands. See Borden Ranch P'ship v. United States Army Corps of Eng'rs, 261 F.3d 810, 814-815 (9th Cir.2001). Although we acknowledge that the CWA is a different statutory scheme from CERCLA, it is noteworthy that, under both environmental statutes, there is no question that the movement of soil that results from affirmative conduct can subject responsible persons to liability.
 
 
 [5]
 Although we would normally address the agency's interpretation of the statute, see Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844-45 (1984), here there is no EPA determination as a point of reference or deference.
 
 
 [6]
 The doctrine of noscitur a sociis is, thus, not particularly helpful. That doctrine stands for the proposition that "`a word is known by the company it keeps.' " United States v. King , 244 F.3d 736, 740 (9th Cir. 2001) (quoting Gustafson v. Alloyd Co., 513 U.S. 561, 575 (1995)). That is, "`words are to be judged by their context and . . . words in a series are to be understood by neighboring words in the series.' " Id. at 740-41 (quoting United States v. Carpenter, 933 F.2d 748, 750-51 (9th Cir. 1991)).
 
 
 [7]
 The dissent's construction of "deposit" is so broad as to include virtually any contamination. As used in the statute, the term is akin to "putting down," or placement. Nothing in the context of the statute or the term "disposal" suggests that Congress meant to include chemical or geologic processes or passive migration. Indeed, where Congress intended such a meaning, it employed specific terminology, such as "leaching," see 42 U.S.C. &#167 9601 (22).
 
 
 [8]
 Our assessment does not diminish the real difference between the two definitions. For example, as the court in CDMG Realty noted, "leach" is included in the definition of "release," but not included in the definition of "disposal." See CDMG Realty, 96 F.3d at 715.
 
 
 [9]
 Those cases would presumably be limited to subsoil migration that halts because it reaches an impermeable barrier (such as a shale layer or retaining wall that completely blocks migration in any direction). Of course, the availability of the defense assumes that the landowner would be able to prove that the contamination hit the impermeable barrier before the land was purchased, and that migration had halted completely.
 
 
 [10]
 It is an open question whether the innocent owner defense is available to only current owners, or both current and past owners. Compare CDMG Realty, 96 F.3d at 716-17 (suggesting that the defense is only available to current owners) with ABB Indus., 120 F.3d at 358 (concluding that it is available to current and past owners).
 
 
 [11]
 See, e.g., U.S. ENVIRONMENTAL PROTECTION AGENCY, POLICY TOWARD OWNERS OF PROPERTY CONTAINING CONTAMINATED AQUIFERS (May 24, 1995) ("where hazardous substances have come to be located on or in a property solely as the result of subsurface migration in an aquifer . . . EPA will not take enforcement action . . . . Further, EPA may consider de minimis settlements . . . where necessary to protect such landowners from contribution suits."); U.S. ENVIRONMENTAL PROTECTION AGENCY, MEMORANDUM REGARDING SUPPORT OF REGIONAL EFFORTS TO NEGOTIATE PROSPECTIVE PURCHASER AGREEMENTS (PPAs) AT SUPERFUND SITES AND CLARIFICATION OF PPA GUIDANCE (January 10, 2001) (encouraging use of PPAs for purchasers of potentially contaminated sites); U.S. ENVIRONMENTAL PROTECTION AGENCY, POLICY TOWARDS OWNERS OF RESIDENTIAL PROPERTY AT SUPERFUND SITES (July 3, 1991) ("EPA . . . will not take enforcement actions against an owner of residential property to require such owner to undertake response actions or pay response costs, unless the residential homeowner's activities lead to a release or threat of a release of hazardous substances . . . ." ).
 
 
 [12]
 Accord Perlman, 165 F.3d at 753 (stating that, where the plain statutory language is unambiguous, we resort to legislative history only to discern whether there is a clear indication "that Congress meant something other than what it said"); 3A NORMANJ. SINGER, STATUTES AND STATUTORY CONSTRUCTION &#167 75.05, at 428 (6th ed. 2000) (when interpreting hazardous waste statutes, "[t]he courts have sought to give effect to the contemporaneous construction given the act by the legislators, the EPA and the public and the central focus is on effecting the intent of Congress as evidenced by legislative history" (footnote omitted)).
 
 
 [13]
 By November 1980, Congress had considered emergency response and hazardous substance cleanup proposals for at least three years. The bill that ultimately became law was an eleventh-hour compromise hastily assembled by a bipartisan leadership group of senators; it was introduced and passed by the Senate with only days remaining in a lame-duck session, and went to the House for an up-or-down vote. Statements in both houses reflected members' belief that the bill was flawed, but was the best that might pass given the circumstances; the pressure on both houses to pass something was compounded by the impending party switch in the Senate and the presidency. See Letter from Senators Robert T. Stafford and Jennings Randolph to Representative James J. Florio (December 2, 1980), reprinted at 1 SENATE COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS, 97th CONG., A LEGISLATIVE HISTORY OF THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980 (SUPERFUND) 774-75 (Committee Print 1983) (hereinafter "Committee Print").
 
 
 [14]
 No committee or conference reports address the version of the legislation that ultimately became law. "[I]t was only last minute, unrecorded compromises and acceptance of deliberate ambiguity in some of the bill's more controversial provisions that permitted the legislation's passage into law." ALLAN J. TOPOL AND REBECCA SNOW, SUPERFUND LAW AND PROCEDURE &#167 1.1, at 5 (1992).
 
 
 [15]
 "During the 1940s and 1950s, Hooker Chemical & Plastics Corporation used the Love Canal, which was built as part of an electrical power project, to dispose of hundreds of 55-gallon drums of chemicals. Hooker then donated the land to the Niagara Falls Board of Education, which, in turn, constructed a school on the site." Topol, supra note 14, &#167 1.1, at 4 n.10. At the "Valley of the Drums" in Kentucky, "users had littered a large ravine with some twenty thousand drums that were spilling hazardous materials into the soil. The pollutants were then percolating into the groundwater." Id. &#167 1.1, at 3. These two high-profile incidents are often cited as the impetus for Congressional action. See id. &#167 1.1, at 1 ("In the beginning man created the Valley of the Drums, Love Canal, and other similar blights upon the earth. Congress saw these horrors and was not pleased.").
 
 
 [16]
 See also 126 CONG. REC. 26795 (1980) (statement ofRep. Goldwater) ("This bill would establish a sizable "superfund" which would pay for the cleanup costs of inactive or abandoned dumpsites which leak hazardous wastes . . . ." ), reprinted at 2 Committee Print, supra note 13, at 381.
 
 
 [17]
 See, e.g., H.R. REP. NO. 96-1016, at 18 (1980) ("At the Valley of the Drums, thousands of barrels were stacked illegally in the hauler's backyard. These drums are in a seriously deteriorating state, and some have already burst and spilled their contents on the ground."), reprinted at 1 Committee Report, supra note 13, at 49.
 
 
 [18]
 See, e.g., 126 CONG. REC. 30931 (statement of Sen. Randolph) (1980) ("Last summer, PCB's leaked from a broken transformer into animal feed at a feed processing plant. The leakage was not discovered in time . . . The dangers posed by buried chemical wastes have only recently begun to make a dent in our national consciousness, largely as a result of the severe health problems discovered at Love Canal."), reprinted at 1 Committee Print, supra note 13, at 683-84."
 
 
 [19]
 See, e.g., S. REP. NO. 96-848, at 5 (1980) ("Spills have taken place because of transportation accidents involving pipelines, trucks, rail cars, and barges or tankers, and also non-transportation facilities such as storage tanks, holding lagoons and chemical processing plants."), reprinted at 1Committee Print, supra note 13, at 312.
 
 
 [20]
 For a more complete discussion of the circumstances surrounding SARA, see TOPOL, supra note 14, &#167 1.3 at 14-15.
 
 
 
 138
 B. FLETCHER, Circuit Judge, with whom Judges Pregerson and Paez, Circuit Judges, join, Concurring in Part and Dissenting in Part.
 
 
 139
 I agree with the majority that CERCLA[1] is not a model of legislative clarity. Inconsistencies and redundancies pervade the statute. As a result, our task in interpreting CERCLA is to search for a construction that produces the fewest inconsistencies and at the same time remains true to the statute's remedial purposes. In holding that passive migration of hazardous waste through soil in this case cannot constitute "disposal" under the Act, the majority misses the mark. If there is a plain meaning in CERCLA's definition of "disposal," it encompasses the sort of passive migration at issue here. Finding such passive migration as a form of "disposal " is consistent with CERCLA's strict liability scheme, that broadly defines "potentially responsible parties" as including those who may have done nothing affirmative to contribute to the contamination of a site and that requires such parties to disprove causation as an affirmative defense. By contrast, excluding this sort of passive migration from the definition of "disposal," as the majority does, frustrates CERCLA's two central purposes: to encourage prompt, voluntary private action to remedy environmental hazards and to ensure that those responsible for the hazards pay their fair share of cleanup costs. Accordingly, I respectfully dissent from Part III of the majority's opinion.
 
 I.
 
 140
 One of the ways in which CERCLA encourages current landowners to clean up environmental hazards on their properties is to allow them to clean up the hazard and then bring suit to recover clean up costs from those who have some responsibility for the existence of the hazard. In order to prevail, the current owner must establish that the defendant is a "potentially responsible party," a party who falls within one of four classes of persons subject to CERCLA liability. See 42 U.S.C. &#167 9607(a). In this case, Carson Harbor argued that the Partnership Defendants are PRPs because they are persons "who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." Id. &#167 9607(a)(2). The district court granted the Partnership Defendants' motion for summary judgment on Carson Harbor's CERCLA claim because it concluded that the Partnership Defendants did not own the property "at the time of disposal of any hazardous substances." Thus, the majority rightly focuses on the meaning of "disposal" in deciding whether the district court's grant of summary judgment was proper. If there was a "disposal " of hazardous waste during the period that the Partnership Defendants owned the property, then, as the majority notes, the Partnership Defendants are PRPs and the district court was wrong to grant them summary judgment. Majority Op. at 874.
 
 
 141
 CERCLA defines "disposal" as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters. " 42 U.S.C. &#167 6903(3) (emphasis added); see id. &#167 9601(29) (referring to &#167 6903(3) for the definition of "disposal"). Although the majority recognizes that almost all of the terms defining "disposal" have both active and passive meanings, it concludes that these terms "simply do not describe the passive migration that occurred here." Majority Op. at 879. In reaching this conclusion, the majority purports to engage in a plain meaning analysis. However, the majority's analysis is nothing more than ipse dixit. Remarkably, nowhere does the majority consider the ordinary, contemporary, common meaning of the terms defining "disposal." See Williams v. Taylor, 529 U.S. 420, 431 (2000) ("We give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." (internal quotation marks and citation omitted)). Had it done so, the majority would have discovered that a common meaning of "deposit" exactly "fit[s] the hazardous substance contamination at issue" in this case. Majority Op. at 879.
 
 
 142
 The Oxford English Dictionary provides the following as one of the common definitions of the transitive form of the verb "deposit": "Said of the laying down of substances held in solution, and of similar operations wrought by natural agencies; to form as a natural deposit." IV THE OXFORD ENGLISH DICTIONARY (OED) 482 (J.A. Simpson & E.S.C. Weiner, eds., 2d ed. 1989).[2] Webster's Dictionary offers a similar definition: "to lay down or let fall or drop by a natural process : foster the accretion or accumulation of as a natural deposit." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (WEBSTER'S) 605 (Philip Babcock Gove, ed.-in-chief, Unabridged ed. 1993). In addition, both dictionaries state that an intransitive definition of "deposit" is "to be laid down or precipitated, to settle." IV OED 482; see WEBSTER'S 605.
 
 
 143
 The evidence in the record is that the slag and tar-like waste was located within a 17-acre open-flow wetlands area of the plaintiff's property. The evidence also indicates that the slag and tar-like substance had high concentrations of lead and TPH. In addition, there is evidence that water flowing through the wetlands carried lead and TPH and that these hazardous wastes settled in the soil throughout the wetlands. Thus, contrary to the majority's conclusory assertion, the plain meaning of "disposal" that includes "deposit" exactly describes the spread of hazardous waste throughout the wetlands: The wastes were carried by the water flowing through the wetlands and deposited in the surrounding soil. Cf. Majority Op. at 879 ("Nor can the gradual spread here be characterized as a `deposit,' because there was neither a deposit by someone, nor does the term deposit encompass the gradual spread of contaminants.").[3]
 
 
 144
 The plain meaning of "deposit" applies to the soil contamination that occurred in this case. Thus, the Partnership Defendants were owners of the property "at the time of disposal." 42 U.S.C. &#167 9607(2). As a result, the Partnership Defendants are PRPs and the district court was wrong to grant them summary judgment dismissing Carson Harbor's CERCLA claim as to them.
 
 II.
 
 145
 As we have noted, CERCLA has two central purposes: "to ensure the prompt and effective cleanup of waste disposal sites, and to assure that parties responsible for hazardous substances [bear] the cost of remedying the conditions they created." Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1300 (9th Cir. 1997) (internal quotation marks and citation omitted). To effectuate the first purpose, Congress designed CERCLA to broadly define PRPs. See 42 U.S.C. &#167 9607(a). To effectuate the second purpose, Congress created affirmative defenses to allow PRPs who bore no responsibility for the hazardous waste to avoid liability. See id. &#167 &#167 9601(35)(A), 9607(b). Also in furtherance of the second purpose, Congress provided for the equitable distribution of cleanup costs among PRPs who cannot avail themselves of an affirmative defense. See id. &#167 9613(f); United States v. Colo. & E. R.R. Co., 50 F.3d 1530, 1536 n.5 (9th Cir. 1995) (describing some of the equitable factors courts consider in determining the proper allocation of cleanup costs among PRPs). The majority's exclusion of parties such as the Partnership Defendants from the class of PRPs frustrates both of CERCLA's central purposes.
 
 
 146
 a. Prompt and Effective Cleanup
 
 
 147
 While it holds that the "passive soil migration " at issue in this case does not constitute "disposal," the majority also concludes that "disposal" may include other sorts of passive migration. Majority Op. at 881. Specifically, the majority opines that the passive spilling or leaking of hazardous wastes may count as "disposal." See, e.g., id. at 881, 886. The majority notes that counting passive spilling or leaking as "disposal" furthers CERCLA's purpose to encourage prompt and effective cleanup of hazardous wastes. Id . at 881. It also notes that were "disposal" read to exclude passive spilling or leaking, there would be little incentive for a landowner to examine her property for hazardous wastes and to clean up any contamination that was discovered. Id. at 881. But, of course, counting the passive migration at issue in this case as "disposal" also would encourage prompt cleanup, and excluding it produces the decreased incentives about which the majority frets: The majority's holding would allow a property owner who discovers hazardous waste passively migrating through the soil to escape all CERCLA liability simply by selling the property to another.
 
 
 148
 The majority's parsimonious reading of "disposal " also leads to plainly nonsensical results. Hazardous waste that is placed directly on or in land and is actively discharging or depositing waste throughout the soil, as is the case here, is likely a more immediate and direct environmental threat than that which is placed into drums or containment pools which may or may not eventually leak. Under the majority's interpretation, however, CERCLA gives the owner of land on which hazardous waste has previously been directly placed less of an incentive to clean up the waste than it does an owner whose land contains leaking drums. The failure to count the passive migration of contaminants through soil as "disposal" thus frustrates CERCLA's first central purpose.
 
 
 149
 The majority reaches this untenable result for two reasons. First, it believes that the plain meanings of "spill" and "leak" describe the passive spread of hazardous waste but that the plain meaning of "deposit" and other terms in the definition of "disposal" that could potentially describe the passive migration at issue in this case do not. Id. at 33. Second, the majority relies on statements in CERCLA's legislative history that indicate that Congress enacted CERCLA in part out of concern for the spillage and leakage of hazardous waste from storage tanks at such places as Love Canal and the Valley of the Drums. Id. at 36, 48-50.
 
 
 150
 However, the majority's plain meaning analysis is patently flawed: Water, flowing through the wetlands, carried the hazardous waste and "deposited" it in the soil throughout the contaminated area. See supra Part I. In addition, the majority recognizes that its reliance on legislative history is a weak reed. As the majority itself notes with candor, "any inquiry into CERCLA's legislative history is somewhat of a snipe hunt." Majority Op. at 885. CERCLA was "an eleventh-hour compromise hastily assembled by a bipartisan leadership." Id. at 885 n.12. As such, there is precious little congressional commentary interpreting the bill that eventually became CERCLA. See id. at 885 n.13 ("No committee or conference reports address the version of the legislation that ultimately became law."). Thus, while the majority finds isolated statements from congressional witnesses, senators, and representatives indicating a concern with the passive spillage or leakage of hazardous waste, this is hardly evidence that Congress meant to limit CERCLA's reach to only those forms of passive contamination that could be described as "spills" or "leaks."
 
 
 151
 b. Fair Share of Remedial Costs
 
 
 152
 The majority's refusal to give full effect to the meaning of "deposit" and other terms also frustrates CERCLA's second central purpose: to ensure that the parties responsible for hazardous waste bear their fair share of cleanup costs.
 
 
 153
 This case presents a perfect illustration. The Partnership Defendants owned the property from 1977 until 1983, when they sold it to Carson Harbor. From 1945 until 1983, Unocal Corporation held a leasehold interest in the property. As the majority notes, Unocal used the property for petroleum production, operating a number of oil wells, pipelines, above-ground storage tanks, and production facilities. Majority Op. at 868. The evidence in the record indicates that the slag and tar-like material were placed on the property some time prior to the Partnership Defendant's ownership. Thus both the Partnership Defendants and Carson Harbor owned the property while lead and TPH from the tar and slag discharged into the wetlands. The only significant distinction between Carson Harbor and the Partnership Defendants is that during the latter's ownership, Unocal was actively engaged in petroleum production on the property. Thus, the Partnership Defendants had more reason to suspect the possibility of hazardous waste contamination than did Carson Harbor. But under the majority's interpretation of "disposal," the Partnership Defendants are completely exempt from liability for the cleanup costs incurred by Carson Harbor. This is an absurd result. By contrast, under the interpretation I urge, the Partnership Defendants would be PRPs and so liable for some of the cleanup costs unless they were able to establish an affirmative defense.
 
 
 154
 The majority appears to believe that counting the sort of passive migration at issue here as "disposal" would "essentially eliminate[ ]" one of a PRP's central affirmative defenses: the "innocent landowner" defense. Majority Op. 881. This defense provides immunity from liability to a PRP who acquired property "after the disposal or placement of [a] hazardous substance" if, "at the time the [PRP] acquired the facility the [PRP] did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility."[4] 42 U.S.C. &#167 9601(35)(A). The majority's reasoning on this point is puzzling. The majority contends that an interpretation of "disposal" that included passive soil migration "would lead to the conclusion that disposal is a never-ending process, rendering liable every landowner after the initial disposal." Majority Op. at 882. It then notes that for subsequent purchasers, the innocent landowner defense would be available "only if one could show that the land was purchased after the hazardous substances were `placed' there." Id. The majority then concludes that the defense would be available only "to a small portion of the landowners who have no actual culpability in the disposal of the hazardous substances." Id. But this conclusion is simply a non-sequitur.
 
 
 155
 Even if we accept for the sake of argument that the more expansive interpretation of "disposal" implies that "disposal is a never-ending process,"[5] it just does not follow that the innocent landowner defense would be available only to those who have "no actual culpability in the disposal of the hazardous substances." Majority Op. at 882 (emphasis added). Congress made the defense available to any PRP who purchases property after the disposal or after the placement of a hazardous substance on the property. 42 U.S.C. &#167 9601(35)(A). Thus, if a PRP purchases property on which hazardous waste is passively migrating through the soil, under my interpretation the innocent landowner defense is not available to the PRP by virtue of the fact that she did not purchase the property after the "disposal" of the waste, since the disposal was on-going. However, if it was a prior owner who placed the hazardous waste on the property, then the defense is available to her by virtue of the fact that she bought the property after the hazardous substance was initially placed on the property.[6] Recognizing that the dispersal of hazardous waste through soil by water is "disposal" under the statute does not eliminate the innocent landowner defense. It "leaves in place the narrow applicability of the defense. " Majority Op. at 887.
 
 
 156
 Nor does the inclusion of passive soil migration give rise to a parade of horribles. A PRP who cannot avail herself of an affirmative defense is liable only for her fair share of cleanup costs. It is up to the district court to apportion costs equitably among all PRPs. 42 U.S.C. &#167 9613(f)(1); see Boeing Co. v. Cascade Corp., 207 F.3d 1177, 1187 (9th Cir. 2000). Among the factors courts consider in allocating responsibility and liability are:
 
 
 157
 (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished; (ii) the amount of the hazardous waste involved; (iii) the degree of toxicity of the hazardous waste involved; (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (v) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (vi) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or the environment.
 
 
 158
 Colorado & E. R.R. Co., 50 F.3d at 1536 n.5. Courts also take into account the existence of contractual or principal/agent relationships among PRPs, Cadillac Fairview/California, Inc. v. Dow Chemical Co., Nos. 83-8034 MRP (BX), 93-7996 MRP (BX), 1999 WL 149196, at *17 (C.D. Cal. Feb. 21, 1997); whether a PRP benefitted from the disposal of waste at the site, id.; whether a PRP has itself engaged in clean-up efforts, Pinal Creek Group v. Newmont Mining Corp., 118 F.3d 1298, 1393 n.4 (9th Cir. 1997), and the circumstances surrounding a PRP's action or inaction, id., United States v. Shell Oil Co., 13 F. Supp. 2d 1018, 1026-27 (C.D. Cal. 1998); and the relative amount of time a PRP owned the property, Dant & Russell, Inc. v. Burlington N. R.R. Co. (In re Dant & Russell, Inc.), 951 F.2d 246, 249 (9th Cir. 1991).[7] As the majority recognizes, CERCLA ensures that a PRP's contribution will be limited to her equitable share. Majority Op. at 882-83. Thus, including as PRPs owners of property in which hazardous waste is passively migrating through the soil does not expose such owners to unbounded liability. It merely holds them accountable for their fair shares of cleanup costs, based upon the circumstances surrounding their ownership.
 
 III.
 
 159
 The structure of the statute, despite its redundancies and inconsistencies, is clear: Liability is not based on causation or fault. Rather, the liability of previous land owners is based on ownership at the time hazardous waste is placed or disposed of on the subject property. The purpose of the statute is to encourage current owners to clean up and eliminate the hazard. The "encouragement" contained in the statute is to allow the current owner to recover aliquot shares of the cost from prior owners. The statute identifies "PRPs" as persons who are potentially liable to the current owners. The statute is clear that PRPs include all persons who owned or operated any facility at which hazardous substances were disposed of.
 
 
 160
 Identified PRPs can assert affirmative defenses to exclude themselves or can advance the reasons why their share of the cost should be minimal, little, or none. However, they should not be able to exclude themselves from PRP status by narrowing or distorting the meaning of "disposal" as the majority has done. The majority perhaps is motivated by a sense that the structure of the statute is unfair by including essentially innocent persons in the process--requiring them to assert their defenses--but that is the structure of the statute. Distorting the meaning of "disposal" under the guise of a"plain meaning" analysis that is seriously flawed is not appropriate.
 
 
 161
 The passive migration of hazardous waste through the soil is a form of "disposal" covered by CERCLA. Because the Partnership Defendants owned the property "at the time of disposal," the district court erred in concluding that they are not PRPs. I would reverse the district court's award of summary judgment to the Partnership Defendants on Carson Harbor's CERCLA claim and remand to allow the Partnership Defendants an opportunity to present an affirmative defense and, should they be unsuccessful, for equitable distribution of the cleanup costs. Accordingly, I respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 I shall use the majority opinion's abbreviations throughout.
 
 
 [2]
 The OED provides the following illustration, from T.H. Huxley's PHYSIOGRAPHY (1878), of this sense of deposit: "[The water] deposits more or less of the matter which it holds in suspension. " IV OED 482 (insertion in original).
 
 
 [3]
 Although I focus on the meaning of "deposit," I note that the plain meaning of other terms defining "disposal" aptly describe the spread of hazardous waste at issue in this case. The term"discharge," for example, has an especially broad meaning. See WEBSTER'S 644 (including in the definition of "discharge," "to give outlet to : pour forth : emit . . . to release or give vent to . . . to emit or give vent to fluid or other contents").
 
 
 [4]
 In order to obtain immunity from liability, the PRP must also demonstrate that "(a) he exercised due care with respect to the hazardous substance concerned, taking into consideration the characteristics of such hazardous substance, in light of all the relevant facts and circumstances, and (b) he took precautions against foreseeable acts or omissions of any . . . third party and the consequences that could foreseeably result from such act or omissions." 42 U.S.C. &#167 9607(b)(3); see 42 U.S.C. &#167 9601(35)(A).
 
 
 [5]
 The majority's use of this assumption is highly questionable. Whether subsoil migration is "a never-ending process, " is clearly a factual question, the answer to which is not obvious. However, there is no evidence in the record to support the majority's supposition.
 
 
 [6]
 The majority makes this very argument elsewhere in its opinion. Read its discussion at pages 882-83.
 
 
 [7]
 These factors are neither exhaustive nor exclusive. In apportioning responsibility among PRP's "a court may consider several factors, a few factors, or only one determining factor, . . . depending on the totality of the circumstances presented to the court." Colorado & E. R.R. Co., 50 F.3d at 1536 (internal quotation marks omitted).