DECISION
Before the Court is Power Test Realty Company Limited Partnership's ("Appellant" or "Power Test") appeal of a decision of the Rhode Island Department of Environmental Management ("DEM"). The DEM decision sustained a Notice of Violation ("NOV") issued against Appellant for alleged violations of the Rhode Island Oil Pollution Control Act ("OPCA") and the accompanying Oil Pollution Control ("OPC") Regulations. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 I Facts and Travel
This matter arises from DEM's Office of Compliance and Inspection's ("OCI") issuance of a July 28, 2005 NOV to Power Test, Getty Properties Corp. ("GPC"), and Getty Petroleum Marketing Inc. ("GPM") as a result of the detection of Light Non-Aqueous Phase Liquid ("LNAPL") in the groundwater at the Power Test Property and the Capital Terminal Company ("CTC") Property (collectively, "the Site"). (OCI NOV, July 28, *Page 2 
2005 ("NOV") at 1.) Appellant's property is located at Dunellen and Dexter Roads in East Providence, Rhode Island.[1]Id. at 1. Installed under and through its property are four pipelines owned by GPM. Two of these pipelines have not been operational since 1975. GPC operated the other two pipelines from 1985 to 1997 to transport unleaded refined gasoline, diesel fuel, and No. 2 heating fuel. In 1997, GPM took control of the two pipelines to transport the same products and subsequently shut them down in 2003.
OCI's investigations into the alleged violations began after DEM received a September 2002 report entitled "Release Investigation Report: Light Non-Aqueous Phase Liquid Occurrence Proximate to Dunellen Road, East Providence, Rhode Island" prepared by Vanasse Hangen Brustlin, Inc. ("VHB") on behalf of CTC.[2] (VHB, "Light Non-Aqueous Phase Liquid (LNAPL) occurrence proximate to Dunnellen Road, East Providence, Rhode Island," Release Investigation Report, Sept. 2002.) Therein, VHB reported that LNAPL — having the characteristics of weathered, leaded gasoline — had been discovered in groundwater monitoring wells located on CTC's property, and the petroleum product pipelines located on the Site were a possible source. Id. at 25-27, 28-29. In its findings of fact, OCI stated that the release of the LNAPL resulted in pollutants entering the waters of the state. (NOV at 2.)
On December 2, 2002, DEM issued a Letter of Responsibility to GPM, Power Test, and GPC, which notified the companies that the aforementioned report documented the presence of separate phase petroleum in groundwater on Parcel 15, and the likely source of the petroleum was the abutting pipeline easement controlled by the three *Page 3 
respondents. (Letter of Responsibility from Margaret Dein Bradley, CPG, December 2002 ("Letter of Responsibility").) The letter further explained that due to the confirmed release of petroleum product to the land and waters of the state, the three respondents were required to perform a site investigation to determine the nature and extent of contamination and to evaluate and design a proposed remedy, as well as submit a Site Investigation Report ("SIR") on or before February 1, 2003. Id. In response to this letter, Power Test, GPM, and GPC notified DEM of their intent not to comply with the requirements set forth therein. Id.
Consequently, on July 21, 2003, DEM issued a Notice of Intent to Enforce, in which Respondents were required to comply with the following: submit a written response to DEM on or before August 8, 2003; notify all abutting owners and tenants on or before August 15, 2003 that a site investigation was to be performed in accordance with the Remediation Regulations; commence site investigation activities no later than August 25, 2003; submit preliminary monitoring well analytical results and a proposal for short term response action on or before September 15, 2003; and submit a Site Investigation Report before October 3, 2003. On August 8, 2003, counsel for Power Test and GPC notified DEM that GPM would take primary responsibility for complying with the requirements set forth in the Notice of Intent to Enforce. (NOV at 3.)
DEM subsequently received a report entitled "Preliminary Monitoring Well Results, Subsurface Investigation," prepared by The Tyree Organization, Ltd. ("Tyree") on behalf of GPM on September 15, 2003. This report explained that soil borings had been advanced on or near Parcel 11 and that soil samples were collected for laboratory analysis. It further disclosed that five groundwater monitoring wells had been installed, *Page 4 
and non-aqueous phase liquid ("NAPL") had been discovered in each groundwater monitoring well. Id.
On December 18, 2003, DEM issued a second Notice of Intent to Enforce to GPM and CTC. This Notice required GPM to submit a focused Site Investigation Work Plan on or before January 9, 2004, and to submit a Sight Investigation Report within seventy-five days of DEM's approval of the focused Site Investigation Work Plan.Id. It further ordered GPM and CTC to resolve all outstanding access issues within thirty days of DEM's approval of the focused Site Investigation Work Plan.
On July 6, 2004, VHB notified DEM that VHB and Tyree had performed groundwater monitoring on the wells located on Parcels 11, 15, and 10.[3] Id. This report stated that all five of the groundwater monitoring wells on or near Parcel 11 contained LNAPL ranging in thickness from 1.33 feet to 2.57 feet, and six of the twenty groundwater monitoring wells on Parcel 15 contained LNAPL ranging in thickness from .09 feet to 2.46 feet.Id. It also determined that the groundwater gauging activities indicated that the GPM pipeline was the most likely source of the LNAPL.[4] Id.
Upon the issuance of the NOV, no party had complied with the Letter of Responsibility and either Notice of Enforcement.Id. The NOV found that "[u]pon information and belief, Respondents discharged petroleum product to the land and waters of the state" and failed to take immediate steps to contain and remove the oil and/or hazardous materials in accordance with the OPC regulations upon their discovery. Id. *Page 5 
The NOV determined that Power Test violated, among other statutes and regulations, the OPCA, G.L. 1956 § 46-12.5.1-3, and OPC Regulations 6(a) and 12(b). Id.
The NOV then ordered Power Test to notify DEM to identify the party that will act as the single point of contact for the Site Investigation, within ten days of receipt of the NOV. Additionally, it required Power Test to provide written notification to all abutting property owners and tenants that an investigation is about to occur at the Site. The NOV also mandated Power Test to begin conducting a Site Investigation within thirty days of receipt of the NOV, and to submit preliminary monitoring well results for review with a proposal to implement a short term response within sixty days of receipt. Id. at 6. Furthermore, it required Power Test to submit a completed Site Investigation Report and Site Investigation Report Checklist within seventy-five days of receipt of the NOV. Under G.L. 1956 § 42-17.6-2, OCI assessed the penalty for the violations as $50,000. Id.
On August 16, 2005, [5] Power Test, GPC, and GPM timely appealed the NOV to the Administrative Adjudication Division of DEM ("AAD"). (Request for Administrative Hearing, Aug. 15, 2005.) Following discovery, the AAD conducted hearings on the matter on May 5 and May 6, 2008, during which Power Test, GPC and GPM presented written evidence and testimony, as well as stipulated to several facts and exhibits. (Admin. Tr., May 5, 2008; Admin. Tr., May 6, 2008.)
On October 20, 2008, the AAD Hearing Officer issued a recommended decision, which was affirmed as a final decision by the DEM Director on October 20, 2008. *Page 6 
Subsequently, on December 23, 2009, the Director of DEM affirmed an amended recommended decision, which contained a recalculated administrative penalty.
In the final decision, the AAD Hearing Officer made findings of fact based on the parties' stipulations. (DEM Decision, December 23, 2009, ("Decision") at 2-6.) He then summarized the testimony at the hearing and each party's argument.Id. at 7-9. Analyzing the OPCA and OPC Regulations violations, the Hearing Officer recognized that OCI found that petroleum had been in the groundwater prior to Power Test's involvement with the property. Under the OPCA, the Hearing Officer noted that OCI contended that a "discharge" is ongoing and, thus, the oil continues to "migrate in the groundwater" until the contaminants are removed.Id. at 23. He additionally explained that Power Test conversely argues that the word "discharge" requires proof that the party, in fact, caused the discharge and that the mere presence of petroleum is not sufficient to constitute a violation of the OPCA and the OPC Regulations. Id.
Addressing Power Test's argument, the Hearing Officer disregarded its supporting case, L.B. Foster Co. v. State,106 S.W.3d 194, 204-207 — which stands for the proposition that the term discharging "requires more than the passive migration of waste through the soil unaided by affirmative human conduct" — because the statute in that case is distinguishable from the Rhode Island OPCA. Id. at 23. In addition, the Hearing Officer noted that the L.B. Foster Co. decision involves a criminal prosecution, unlike the instant matter. Id.
Instead of following Power Test's supporting law, the Hearing Officer turned to AAD precedent and a Superior Court bench decision on appeal from DEM. Id. at 23-25. The Hearing Officer referenced Merva v. Department of Environmental Management, *Page 7 
C.A. No. PC 97-0115, in which the Appellant appealed from a judgment by DEM holding him responsible for petroleum contamination on his property caused by a prior owner because of his failure to remediate the contamination. Id. at 24-25. The Hearing Officer explained that in a bench decision, the Superior Court justice mentionedin dicta that through enacting the "new Oil Pollution Control Act, the legislature defined discharge. . . . Strict liability for cleanup on account of passive conduct is now definitively and clearly imposed." Id. at 25. In accordance with this premise, the Hearing Officer found that the OPCA and OPC regulations "provide a definition of discharge which encompasses the Respondent's failure to act . . . Respondent's liability can be imputed to a property owner for passive conduct for failure to remove petroleum contaminants form the groundwater under its property once discovered." Id. at 26. He elaborated that "this liability is not excused by the fact that the petroleum was released by a prior owner." Id.
Finding that the testimony, stipulated facts, and exhibits provide sufficient evidence that petroleum product is present in the groundwater, the Hearing Officer concluded that leaching currently exists and has existed since Power Test took ownership of the property.[6] Given the definition of discharge, the Hearing Officer found that the leaching of petroleum in the groundwater of Power Test is a "discharge" under the OPCA and OPC Regulations. Accordingly, the Hearing Officer concluded that under the OPCA *Page 8 
and OPC Regulations, Power Test is responsible for the mitigation and remediation of the contamination once aware of its presence. The Hearing Officer further found that as liability for the failure to remove contaminants from the groundwater rests with the property owner, only Power Test, not GPC or GPM, is responsible for the violation. The assessed penalty for these violations was $50,000.
Power Test timely appealed the DEM Decision to the Court. Upon appeal, Power Test avers that DEM's interpretation of the OPCA is clearly erroneous because causation is required under this statute. Furthermore, Power Test argues that DEM's interpretation of the OPCA renders the Rhode Island Industrial Property Remediation and Reuse Act ("IPRRA") meaningless. It additionally contends that DEM's decision was arbitrary and capricious because no factual basis exists to uphold the NOV, as Power Test claims that it did not have knowledge of the LNAPL until the NOV. Finally, Power Test maintains that even if it is liable under the OPCA, it may only be liable for the LNAPL on its own property.
In response, DEM argues that its interpretation of the OPCA and OPC Regulations is not clearly erroneous because their standard of liability applies regardless of fault. In addition, DEM opines that the OPCA is a separate statute from IPRRA and, therefore, both create schemes of liability without rendering each other meaningless. DEM also contends that Power Test had knowledge prior to the issuance of the NOV; accordingly, it argues that its decision is not arbitrary and capricious. *Page 9 
 II Standard of Review
The Court reviews contested administrative decisions pursuant to the Administrative Procedures Act ("APA"). Section 42-35-15. That section provides the following:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure; (4)Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Sec. 42-35-15(g).
Under this statute, the Court must uphold the agency's decision if legally competent evidence exists in the record. Town ofBurrillville v. Rhode Island State Labor Relations Bd.,921 A.2d 113, 118 (citation omitted). Legally competent evidence is "`the presence of some or any evidence supporting the agency's findings.'" Auto Body Assoc. of R.I. v. Rhode Island Dep't ofBusiness Regulation, 996 A.2d 91, 95 (R.I. 2010) (quotingEnvironmental Scientific Corp. v. Durfee,621 A.2d 200, 208 (R.I. 1993)) *Page 10 
(citing Sartor v. Coastal Resources Mgmt. Council,542 A.2d 1077, 1082-83 (R.I. 1988)). Thus, the court may not substitute its judgment on questions of fact for that of the agency, "even in a case in which the court `might be inclined to view the evidence differently and draw inferences different from those of the agency.'" Johnston Ambulatory Surgical Assocs.,Ltd. v. Nolan, 775 A.2d 799, 805 (R.I. 2000) (quoting RhodeIsland Telecommunications Auth. v. Rhode Island State LaborRelations Bd., 650 A.2d 479, 485 (R.I. 1994)). Although the Court affords an agency deference to its factual findings, questions of law are reviewed de novo. Iselin v. Retirement Bd. ofEmployees' Retirement Sys. of R.I.,943 A.2d 1045, 1049 (R.I. 2008) (citation omitted).
DEM uses a two-tier review process in which a hearing officer first hears grievances and then issues a written decision that is submitted to the Director of DEM. The Director considers the decision, along with any further arguments, and renders his or her own decision. This two-tier review is similar to a funnel.Environmental Scientific Corp. v. Durfee,621 A.2d 200, 207-08 (R.I. 1993). The hearing officer, at the first level of review, "sits as if at the mouth of the funnel" and analyzes the evidence, testimony, and issues. Id. At the "discharge end of the funnel," the second level of review, the DEM Director does not receive the information considered by the hearing officer first-hand. Id. Accordingly, the "further away from the mouth of the funnel that an administrative official is . . . the more deference should be owed to the fact finder." Determinations of credibility by a hearing officer, for example, should not be disturbed unless they are "clearly wrong." Id. at 206. *Page 11 
 III Analysis A OPCA, Strict Liability, and Causation 1 Language of the Statute
On appeal, Power Test contends that DEM's decision is clearly erroneous because DEM's interpretation of the OPCA is contrary to its plain language. Preliminarily, it argues that the clear and unambiguous language of the OPCA provides that a person, either through act or omission, must, in fact, cause oil to enter into the land. Thus, Power Test avers that DEM erroneously interpreted the OPCA and accompanying OPC Regulations as applying to conduct which occurred after the petroleum entered the environment. It therefore asserts that the Court need not defer to DEM's interpretation, which is based solely on Power Test's landowner status and not culpability, because it is clearly erroneous.
Conversely, DEM avers that the OPCA and OPC regulations are meant to apply liability broadly, regardless of fault. Hence, DEM maintains that the language of the statute applies responsibility to a party, like Power Test, which fails to perform remedial actions when an ongoing migration of petroleum already released into groundwater is discovered. Accordingly, DEM opines that its interpretation is not clearly erroneous in light of the language within the statute.
The Rhode Island OPCA provides that "[n]o person shall discharge, cause to be discharged, or permit the discharge of oil into, or upon the waters of the land of the state *Page 12 
except by regulation or by permit from the director." G.L. 1956 § 46-12.5.1-3; see also OPC Regulations Rule 6(a) ("No person shall place oil or pollutants into the waters or land of the State or in a location where they are likely to enter the waters of the State. . . ."); OPC Regulations Rule 12(b) (stating the required actions "[w]hen a release of oil occurs" by "any person subject to these regulations"). When an administrative agency interprets a statute of which it is charged with the enforcement, the Court must "accord that interpretation `weight and deference as long as that construction is not clearly erroneous or unauthorized.'" Labor Ready Northeast, Inc. v. McConaghy,849 A.2d 340, 344-45 (R.I. 2004) (quoting In re Lallo,768 A.2d 921, 926 (R.I. 2001)). This deference is warranted even if any alternative permissible interpretations exist. Id. (citingPawtucket Power Assocs. Ltd. P'ship v. City of Pawtucket,622 A.2d 452, 456-57 (R.I. 1993)). Upon examining language of the statute and regulations, as well as the parties' arguments, DEM found that the OPCA
 "provide[s] a definition of discharge which encompasses the Respondent's failure to act. I find that the Respondent's liability can be imputed to a property owner for passive conduct for failure to remove petroleum contaminants from the groundwater under its property once discovered. This liability is not excused by the fact that the petroleum was released by a prior owner." (Decision at 26.)
Within the OPCA, "discharge" is defined as "any spilling leaking, pumping, pouring, emitting, emptying, releasing, injection, escaping, leaching, dumping, or disposing into the environment." Sec. 46-12.5.1-1(i). In this matter, the Hearing Officer defined the movement of the oil as "leaching." As cited by the Hearing Officer, leaching is defined as the "process by which moving fluid separates the soluble components of a material . . . [and] is sometimes used to describe the migration of contaminating *Page 13 
materials, by rain or groundwater, from a fixed source, such as a landfill." Blacks Law Dictionary 969 (9th ed. 2009);see also Carson Harbor Vill., Ltd. v. UnocalCorp., 270 F.3d 863, 879 n. 7 (9th Cir. 2001) (explaining that when Congress meant to include chemical or geological process or passive migration, it employed specific terminology, such as leaching); Webster's II New CollegeDictionary 623 (2001) (defining leaching as removing "soluble constituents from by the action of a percolating liquid").
Leaching, therefore, by its plain meaning, is a passive and continuous action. See, e.g., Olin Corp. v. CertainUnderwriters at Lloyd's London, 468 F.3d 120, 129 (2d Cir. 2006) (defining leaching as "ongoing passive contamination"); WellsFargo Bank, N.A. v. Renz, No. C 08-02561 SBA, — F. Supp. 2d —, 2011 WL 2360060, *7 (N.D. Cal. June 9, 2011) (citation omitted) (stating that leaching is a passive term); Castaic Lake WaterAgency v. Whittaker Corp.,272 F. Supp. 2d 1053, 1077 (C.D. Cal. 2003) (defining leaching as a passive migration (citing ABB Industrial Sys., Inc. v. PrimeTech., Inc., 120 F.3d 351, 358 (2d Cir. 1997)). The passive connotation of leaching as the gradual spread of contaminants evidences the General Assembly's intent to create a broad definition of the term "discharge." See Carson Harbor Vill.,Ltd., 270 F.3d at 878-79; see also Port ofPortland v. Union Pacific R.R. Co., No. 98-886-ST,1999 WL 1080328, *17 (D.Or. filed Nov. 30, 1999) ("By including `leaching' in the definition of `release,' it is clear that the [the state] Legislature intended to cover the broadest number of individuals as possible. Individuals who own property onto which hazardous substances have leached and continue to leach are [potentially responsible parties].") Accordingly, "permitting a discharge," in the form of leaching, conveys the failure to remediate the continuous migration of oil into the State's land. *Page 14 
Notwithstanding the use of "leaching," Power Test argues that the inclusion of the term "into" within the OPCA requires causation. The plain meaning of the preposition "into" is "[t]o the inside or interior of." Webster's New College DictionaryII 581 (2001). Within the context of the section, contaminants "leach into" — or "to the inside of" — the land when they "passively migrate" within it. See Olin Corp., 468 F.3d at 129;Carson Harbor Vill., Ltd., 270 F.3d at 878-79. As such, Power Test's reliance on the term "into" is misplaced because the term "into" read in conjunction with "leaching" does not require causation for liability.
This interpretation is bolstered by the stated purpose of the OPCA: to ensure that "[t]he citizens of the state should not have to bear the burdens of the cleanup and the losses of economic livelihood that result from the discharge of oil in any degree." Sec. 46-12.5.1-6(a)(2). Similarly, through the Federal Water Pollution Control ("Clean Water Act" or "CWA"), Congress placed "a major part of the financial burden for achieving and maintaining clean water upon those who would profit by the use of our navigable waters and adjacent areas, and who pollute the same."U.S. v. Coastal States Crude Gathering Co.,643 F.2d 1125, 1128 (5th Cir. Unit A Apr. 1981).[7] Thus, the lack of a causation requirement[8] represents a constitutional shift of the burden for the cleanup from "the *Page 15 
public to the offending users albeit good faith, non negligent users." Id. Similarly, DEM's interpretation of the statute is consistent with its stated purpose because it ensures that Rhode Island citizens will not have to bear the costs of a cleanup.[9]
Power Test supports its interpretation by arguing that Cookman Realty Group v. Taylor,566 S.E. 294 (W.Va. 2002), confirms that the owner of land is not responsible for remediation when the prior owner was the only source of the release of oil. The regulation at issue in that matter provides the following:
 "`Except for any source or class of sources which has been granted a variance for the particular contaminant at issue, any person who owns or operates a source subject to the Act which has caused, in whole or in part, the concentration of any constituent to exceed any applicable groundwater quality standard subject to the Act, must cease further release of that contaminant and must make every *Page 16 
reasonable effort to identify, remove or mitigate the source of such contamination and strive where practical to reduce the level of contamination over time to support drinking water use of such groundwater.'" Cookman Realty Group, 566 S.E.2d at 297 (quoting W. Va. Code R. § 47-57-4.1 (1994)).
Under the definitions therein, the term "source" is "`any facility or activity which has caused a release or is reasonably likely to cause a release.'"Id. at 298 (quoting W. Va. Code R. § 47-57-2.13)). Defining the terms "facility" and "activity" with their plain and ordinary meanings, the Cookman Realty Group Court determined that the Defendant at issue was classified as neither because the Defendant never performed a positive act and none of its current or former owners used the space for hazardous materials storage, use, or disposal. Id. at 299.
As a result of the West Virginia regulation language "[a]lthough a `release' may indeed arise from an `omission,' there still remains the limitation that a landowner, in order to be deemed the owner of a `source,' must be in control of a `facility' or otherwise engaged in an activity that causes such a release." Id. Accordingly, pursuant to the West Virginia regulation, the owner of a "source" may not be subject to a remediation order "where it is demonstrated that neither the landowner nor its predecessors in title were involved in originating such pollution." Id. at 299-300.
The use of the term "source" and its definition distinguish the West Virginia statute at issue in Cookman Realty Group from the Rhode Island OPCA. For example, the OPCA fails to include the terms "source," "activity," or "facility," like the West Virginia regulation; instead, in the Rhode Island OPCA, the broad definition of person includes "an individual, trust, firm, joint stock company, corporation, . . . club, non profit *Page 17 
agency, country." Compare
W. Va. Code R. § 47-57-4.1 with Sec. 46-12.5.1-3. Moreover, the West Virginia statute requires the person to have "caused, in whole or in part," while the Rhode Island OPCA requires the "person" merely to "discharge, cause to be discharged, or permit thedischarge." Compare
W. Va. Code R. § 47-57-4.1, with
Sec. 46-12.5.1-3 (emphasis added). The plain language of the OPCA, unlike that of the West Virginia statute in Cookman RealtyGroup, demonstrates the intent of the General Assembly to create the extensive liability scheme recognized by DEM. DEM's interpretation of the OPCA and its accompanying regulations, accordingly, is not clearly erroneous.
 2 IPRRA's Petroleum Exclusion
Power Test further maintains that DEM's interpretation is clearly erroneous because it renders the petroleum exclusion within IPRRA meaningless. DEM, however, contends that IPRRA and OPCA are two separate statutes and, therefore, the petroleum exclusion is not rendered meaningless by OPCA's strict liability scheme.
IPRRA, like the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), [10] excludes "petroleum" under its definition for hazardous substances. G.L. 1956 § 23-19.14-3 ("Hazardous material does not include petroleum for the purposes of this chapter.");see 42 U.S.C. § 9601(14) ("[T]he term [hazardous materials] does not include petroleum, including crude oil or any fraction *Page 18 
thereof . . . and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel. . . ."). The General Assembly is "`presumed to know the state of existing law when it enacts or amends a statute.'" Moreau v.Flanders, 15 A.3d 565, 586 n. 21 (quoting State v.Greenberg, 951 A.2d 481, 491 (R.I. 2008)). Thus, when the General Assembly passed the OPCA in 1997, it knew that IPRRA, enacted in 1995, excluded the petroleum covered within the OPCA.See 1997 R.I. Pub. Laws 207; 1995 R.I. Pub. Laws 724. Hence, in enacting IPRRA, the General Assembly intended for "the obligations of the responsible parties for releases of petroleum [to be] the same as those provided under any other application, provisions or rule of law," such as the OPCA. Id. DEM's interpretation, therefore, does not render IPRRA meaningless, as the General Assembly intended for OPCA, which contains different responsibilities and penalties than IPRRA, to impose strict liability without a causation requirement for petroleum contamination.
 3 Liability for Cleanup as Land Owner
Power Test also argues that the NOV only imposes liability based on its status as a landowner; therefore, it cannot be liable for oil on any other property besides its own. As previously explained, the OPCA bars any "person" from discharging, causing a discharge, or permitting a discharge of oil into the land or waters of the state. Sec. 42-12.5.1-3. As evidenced by this language and the purpose of the statute — to shield the public from bearing the burdens of the cleanup — liability does not fall on the person whose land onto which the oil leaches. In contrast, according to the plain language, the person who causes or permits the discharge is liable. Therefore, in accordance with the *Page 19 
statute, DEM's decision imposes liability on Power Test as the landowner of the land from which the oil leached, not as the landowner of land on which some oil may be located.[11]
 B Substantial Evidence
Power Test argues that even if DEM's interpretation is not clearly erroneous, it did not have knowledge of the leaching oil until OCI issued the NOV. Power Test, therefore, maintains that the DEM decision was arbitrary and capricious because no factual basis exists to uphold the NOV. DEM counters that the decision contains sufficient evidence that DEM had knowledge of the leaching oil prior to the issuance of the NOV.
Rhode Island courts afford great deference to agency decisions under the "arbitrary and capricious" standard of review.Goncalves v. NMU Pension Trust,818 A.2d 678, 682-83 (R.I. 2003). Accordingly, the Court will uphold the administrative decision unless the officer did not act within her authority and her decision was not "rational, logical, and supported by substantial evidence." Id. (citing Doyle v.Paul Revere Life Insurance Co.,144 F.3d 181, 184 (1st Cir. 1998)).
On December 2, 2002, DEM issued a Letter of Responsibility to GPM, Power Test, and GPC. (Letter of Responsibility.) This letter notified these parties that the likely source of the petroleum found on the land and waters of the state was from Power Test's *Page 20 
property. Id. (stating that "[t]he likely source of the petroleum was the abutting pipeline easement controlled by Getty Properties Corp. (`the Site')"). In response to this letter, Power Test, GPM, and GPC notified DEM of their intent to not comply with the requirements set forth within the letter. (NOV at 4.)
In its decision, DEM noted that the LNAPL in question was observed on March 22, 2002. (Decision at 4.) Additionally, DEM explained that on July 21, 2003, DEM issued a Notice of Intent to Enforce to Power Test. Id. at 4. It concluded in its finding of facts that "the presence of the petroleum product in the groundwater was made known to [Power Test] on or after March 22, 2002."Id. at 33. The correspondence between DEM and Power Test, including the Letter of Responsibility and Notice of Intent to Enforce, represents competent evidence that Power Test had knowledge of the violation. Accordingly, DEM's decision is not arbitrary or capricious.
 IV Conclusion
After a review of the entire record, the Court finds that DEM's decision was neither clearly erroneous nor arbitrary or capricious in view of the reliable, probative, and substantial evidence on the whole record. Substantial rights of the Appellant were not prejudiced. Counsel shall submit appropriate judgment for entry.
[1] This property is specifically identified as East Providence Tax Assessor's Plat 204, Block 1, Parcels 9 and 11.
[2] CTC's property is Parcel 15. Abutting Dunellen Road, this property lies to the north of Power Test's property.
[3] Parcel 10 is located south of Parcel 11 and is owned by Seekonk Corp.
[4] Prior to the NOV, Tyree and VHB continued to monitor the Site and submit reports to DEM.
[5] Following this appeal, on September 30, 2005, Tyree, on behalf of GPM, submitted to DEM the SIR for the Site. (The Tyree Organization, Ltd., Site Investigation Report, Assessor's Map 204, Block 1, Parcels 9, 11, and 15, Sept. 30, 2005.)
[6] The Hearing Officer defined leaching according to Black'sLegal Dictionary (8th ed. 2004) as the following:
 "The process by which moving fluid separates the soluble components of a material. Under CERCLA, leaching is considered a release of contaminants. The term is sometimes used to describe the migration of contaminating materials, by rain or groundwater, from a fixed source, such as a landfill. 42 U.S.C.A. § 9601 (22)."
[7] See, e.g., U.S. v. Dixie Carriers, Inc.,627 F.2d 736, 741 (5th Cir. 1980) (noting that this section provides for limited recovery under a strict liability theory);U.S. v. City of New York, 481 F. Supp. 4, 7 (D.C.N.Y. 1979) (concluding that "[t]he civil penalty provision of [the CWA] is clearly one of strict liability . . . and every court which has considered the question has so held" (collecting cases) (internal quotations and citation omitted)), aff'd without opinion,614 F.2d 1292 (2d Cir. 1979); O'Neil v. Picillo,682 F. Supp. 706, 719 (D.R.I. 1988) (citing legislative history to explain that "judicial interpretations of [CWA] section 311 [] impose strict liability").
[8] This liability scheme is comparable to common law strict liability for ultrahazardous activities because
 "the owner and operator of the vessel or facility would be deemed insurers for a harm flowing from what made the activity hazardous in the first place: a release of oil or hazardous substance. The culprit for purposes of causation was the vessel or facility, and both the owner and operator would be liable regardless of whether their individual conduct caused the release. . . . [T]he owner of a vessel might not have personally engaged in any direct conduct causing a release but the act of ownership would be sufficient for strict liability." James R. MacAyeal, "The Comprehensive Environmental Response, Compensation, and Liability Act: The Paradigm of Strict Liability and the Problem of Individual Causation," 18 UCLA J. Envtl. L. Pol'y 217, 273 (2000) (emphasis added) (discussing the strict liability scheme within the Clean Water Act).
[9] The imposition of strict liability under this statute is further colored by the interoperations of similar statutes in other jurisdictions. For example, Virginia's statute attaches liability to "any person" or "any operator of a facility" that "discharges, causes or permits a discharge: of oil into or upon state water, lands, or storm drain systems. . . ." Va. Code Ann. § 62.1-44.34:18(B) (2011). This statue "`imposes strict liability for discharges of oil onto private and public lands.'"Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.,174 F.R.D. 609, 621 (M.D.Pa. 1997) (quoting Gollobin v. AirDistributing Co., 838 F. Supp. 255, 257 n. 7 (E.D.Va. 1993)). This Virginia statute is "not limited to persons or facilities currently discharging oil into or onto state or private lands."Id.
[10] When enacting CERCLA, Congress excluded petroleum-based wastes because "petroleum product spills into navigable waters were already covered by § 311 of the Clean Water Act and because at the time Congress was considering CERCLA, it was also debating a parallel land-based oil-spill bill (which never passed)." John S. Applegate, Jan G. Laitos, Celia Campbell-Mohn, The Regulation ofToxic Substances and Hazardous Wastes 958 (2000).
[11] The Court, however, finds it curious that the Hearing Officer so swiftly dismissed GPC and GPM. Additionally, the Court questions why the abutting property owners were never considered. Nevertheless, those questions are not before the Court, and under the arbitrary and capricious standard, the Hearing Officer's decision was supported by the competent evidence on the record.
 *Page 1